# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

Case No. 23-13508

JOHN LABRIOLA,

      Appellant,

v.

MIAMI-DADE COUNTY,

      Appellee.

_____/

## APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF FLORIDA

## APPELLANT'S INITIAL BRIEF

Alexander Bumbu
**PACIFIC JUSTICE INSTITUTE**
1021 Ives Dairy Rd.
Ste. 115
Miami, FL 33179
Tel: (786) 496-3946
Email: abumbu@pji.org

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, 11th Cir. R. 26.1, and 11th Cir. R. 28-1(b), Appellant John Labriola respectfully submits the following list of trial judges, attorneys, persons, associations of persons, firms, partnerships, and corporations that to his knowledge have an interest in the outcome of this case or appeal, including subsidiaries, conglomerates, affiliates, parent corporations, any publicly held corporation that owns 10% or more of the party's stock, and other identifiable legal entities related to a party.

<u>INTERESTED PARTIES</u>

1. Becerra, Hon. Jacqueline – United States Magistrate Judge

2. Bumbu, Alexander – Counsel for Appellant

3. Candela, William X. – Assistant Miami-Dade County Attorney and counsel for Appellee

4. de Oña, Andrea – Assistant Miami-Dade County Attorney and counsel for Appellee

5. Huck, Hon. Paul C. – Senior United States District Judge

6. Labriola, John – Appellant

7. Miami-Dade County – Appellee

8. Miami-Dade County Attorney's Office – Counsel for Appellee

9. Pacific Justice Institute, Inc.[1]

To the best of his knowledge, Appellant certifies that no publicly traded company or corporation has an interest in the outcome of this case or appeal.

---

[1] Pacific Justice Institute, Inc. (or "PJI" for short) is Appellant's counsel and a public interest law firm. PJI is a nonprofit religious corporation formed in California. Alexander Bumbu is the attorney from PJI who is handling the representation of Appellant.

## STATEMENT REGARDING ORAL ARGUMENT

Appellant does not request an oral argument.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ...............................................................C-1

INTERESTED PARTIES ......................................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ............................... i

TABLE OF AUTHORITIES ................................................................ iv

STATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION ................................................................. viii

STATEMENT OF THE ISSUES ............................................................1

STATEMENT OF THE CASE ...............................................................2

    Course of Proceedings and Dispositions in the District Court ........................2

    Statement of Facts ..........................................................................3

    Standard of Review ......................................................................10

SUMMARY OF THE ARGUMENT ....................................................11

ARGUMENT.......................................................................................15

    The District Court Erred in Holding that Miami-Dade County Implementing Order 7-45 is not Unconstitutionally Overbroad ...................16

    The District Court Erred in Concluding that the Suspension, Training Order, and Firing Passed the Pickering-Connick Test for Public Employee Free Speech and, thus, in Granting Summary Judgment to the County on Counts I, II, IV, V, and VI ...............................23

        The District Court Erred in Concluding that the County's Efficiency Interest Outweighed Labriola's Interest in Speaking...............................................................................25

        The Suspension and Training Order Were Adverse Employment Actions.........................................................33

        The Last Two Steps of the Pickering-Connick Test ...........................35

The District Court Erred in Granting Summary Judgment to the
County on Count II Because That Count is not Based on the
*Pickering-Connick* Test .................................................................36

    The District Court Erred in Granting Summary Judgment to
    the County on Count II Because the County Fired Labriola
    for Declining to Undergo What Could Have Been Compelled
    Speech .................................................................................37

The District Court Erred by Granting Summary Judgment to the
County on Count VII ......................................................................39

The District Court Misquoted Labriola .........................................40

The County Has Municipal Liability Under 42 U.S.C. § 1983 For
All Three Adverse Employment Actions Taken Against Labriola:
The Suspension, The Order To Undergo The Training, And The
Firing ..............................................................................................41

CONCLUSION ...................................................................................42

CERTIFICATE OF COMPLIANCE......................................................44

CERTIFICATE OF SERVICE ...............................................................45

# TABLE OF AUTHORITIES

**Page(s)**

## <u>Cases</u>

*Anderson v. Burke Cnty.*,
239 F.3d 1216 (11th Cir. 2001) ............................................................ 26, 27

*Anderson v. Liberty Lobby*,
422 U.S. 242 (1986) ..................................................................... 15

*Bailey v. Wheeler*,
843 F.3d 473 (11th Cir. 2016) ..................................................... 33

*Beckwith v. City of Daytona Beach Shores*,
58 F.3d 1554 (11th Cir. 1995) ..................................................... 25

*Bell v. Sheriff of Broward Cnty.*,
6 F.4th 1374 (11th Cir. 2021) ..................................................... 34

*Bennett v. Hendrix*,
423 F.3d 1247 (11th Cir. 2005) ................................................... 33

*Boim v. Fulton Cnty. Sch. Dist.*,
494 F.3d 978 (11th Cir. 2007) ............................................... 10, 15

*Branzburg v. Hayes*,
408 U.S. 665 (1972) ............................................................... 14, 40

*Bryson v. City of Waycross*,
888 F.2d 1562 (11th Cir. 1989) ................................................... 24

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ..................................................................... 15

*Cochran v. City of Atlanta*,
289 F. Supp. 3d 1276 (N.D. Ga. 2017) ...................................... 26

*Connick v. Myers*,
461 U.S. 138 (1983) ......................................................... 24, 26, 28

*Cooper v. Dillon*,
403 F.3d 1208 (11th Cir. 2005) ................................................... 39

*Davis v. Legal Servs. Ala.*,
19 F.4th 1261 (11th Cir. 2021) ................................................... 34

iv

*Doe v. Valencia Coll.*,
903 F.3d 1220 (11th Cir. 2018) .............................................. 22, 23

*Feiner v. New York*,
340 U.S. 315 (1951) ................................................................ 30

*Gala v. City of New York*,
525 F. Supp. 3d 425 (E.D. N.Y. 2021) ..................................... 30

*Garcetti v. Ceballos*,
547 U.S. 410 (2006) ................................................................ 24

*Goza v. Memphis Light, Gas & Water Div.*,
398 F. Supp. 3d 303 (W.D. Tenn. 2019) ......................... 28, 29, 30

*Green v. Finkelstein*,
73 F. 4th 1258 (11th Cir. 2023) ............................................... 27

*Gresham v. City of Atlanta*,
542 F. App'x. 817 (11th Cir. 2013) ..................................... 26, 27

*Hiers v. Bd. of Regents of the Univ. of N. Tex. Sys.*,
No. 4:20-CV-321-SDJ, 2022 U.S. Dist. LEXIS 43617
(E.D. Tex. March 11, 2022) ..................................................... 37

*Hoefling v. City of Miami*,
811 F.3d 1271 (11th Cir. 2016) ............................................... 41

*Houchins v. KQED*,
438 U.S. 1 (1978) ................................................................... 40

*James v. Montgomery Reg'l Airport Auth.*,
No. 2:15-cv-332-MHT-GMB [WO], 2017 U.S. Dist. LEXIS 119815
(M.D. Ala. July 28, 2017) ....................................................... 27

*Janus v. AFSCME, Council 31*,
138 S. Ct. 2448 (2018) ............................................................ 37

*Liverman v. City of Petersburg*,
844 F.3d 400 (4th Cir. 2016) ................................................... 16

*Lovell v. City of Griffin*,
303 U.S. 444 (1938) ........................................................... 14, 40

*Mahanoy Area Sch. Dist. v. B.L.*,
141 S. Ct. 2038 (2021) .............................................................. 9

*Millspaugh v. Cobb Cnty. Fire and Emergency Servs.*,
    No. 22-10132, 2022 U.S. App. LEXIS 32226
    (11th Cir. Nov. 22, 2022) ........................................................... 26, 27

*Moss v. City of Pembroke Pines*,
    782 F.3d 613 (11th Cir. 2015)........................................... 26, 27, 29

*New York Times Co. v. Sullivan*,
    376 U.S. 254 (1964) ............................................................................ 28

*O'Laughlin v. Palm Beach Cnty.*,
    30 F.4th 1045 (11th Cir. 2022)............................... 11, 16, 17, 21

*Pickering v. Bd. of Educ.*,
    391 U.S. 563 (1968) ............................................................................ 24

*Rankin v. McPherson*,
    483 U.S. 378 (1987) ................................................................. 25, 26, 28

*Shahar v. Bowers*,
    114 F.3d 1097 (11th Cir. 1997)..................................................... 36

*Snipes v. Volusia Cnty.*,
    704 F. App'x. 848 (11th Cir. 2017)...................................... 26, 27

*Snyder v. Phelps*,
    562 U.S. 443 (2011) .............................................................................. 8

*Stavropoulos v. Firestone*,
    361 F.3d 610 (11th Cir. 2004)........................................................ 33

*Stroes v. Town of Davie*,
    No. 18-62760-CIV-MORENO/SELTZER, 2019 U.S. Dist. LEXIS
    87188 (S.D. Fla. May 22, 2019).................................................. 28

*United States v. Nat'l Treasury Emps. Union*,
    513 U.S. 454 (U.S. 1995) .......................................................... 16

*Waters v. Churchill*,
    511 U.S. 661 (1994) ......................................................................... 26

## <u>Constitutional Provisions</u>

Amend. I, U.S. Const. ................................................................. *passim*

## Statutes and Ordinances

28 U.S.C. § 1291 ........................................................................... viii

28 U.S.C. § 1331 ........................................................................... viii

28 U.S.C. § 1343(a)(3) ................................................................... viii

42 U.S.C. § 1983 ........................................................................ *passim*

Miami-Dade County Code of Ordinances § 2-01(2)(e) ........................................ 42

Miami-Dade County Implementing Order 7-45 ............................................ *passim*

## Court Rules

11th Cir. R. 26.1 .............................................................................. C-1

11th Cir. R. 28-1(b) .......................................................................... C-1

Fed. R. App. P. 26.1 .......................................................................... C-1

Fed. R. App. P. 32(a)(5) ....................................................................... 44

Fed. R. App. P. 32(a)(6) ....................................................................... 44

Fed. R. App. P. 32(a)(7)(B) .................................................................... 44

Fed. R. App. P. 32(f) ........................................................................... 44

Fed. R. Civ. P. 56(a) ........................................................................... 15

## Other Authorities

Potter Stewart, "*Or of the Press*," 26 Hastings L.J. 631 (1975) ............................. 40

## STATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION

This is a civil rights suit brought through 42 U.S.C. § 1983 to vindicate Appellant John Labriola's ("Labriola") First Amendment rights. Therefore, the district court had federal question jurisdiction over this suit pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3). After discovery was conducted, both parties filed motions for summary judgment. [Docs. 43 and 44]. Appellee Miami-Dade County ("County") sought summary judgment on all counts. [Doc. 44 pp. 2, 20]. Labriola sought summary judgment on Counts I, III, IV, and VI. [Doc. 43 pp. 4, 20]. On September 21, 2023, the district court granted the County's motion for summary judgment and denied Labriola's motion. [Doc. 61]. The next day, the district court entered the final judgment, which reflected its ruling on the parties' motions for summary judgment. [Doc. 62]. Therefore, this is an appeal from a final order and judgment that disposed of all the parties' claims. Thus, this Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291. Labriola timely filed his Notice of Appeal with the district court on October 21, 2023. [Doc. 65].

# STATEMENT OF THE ISSUES

**Issue I:** Labriola was a low-level, behind-the-scenes employee of the County. Due to an Opinion Piece that Labriola wrote on his own time, his boss suspended him without pay for three days and ordered him to undergo additional training. His boss claimed that the Opinion Piece violated Miami-Dade County Implementing Order 7-45 ("IO 7-45"). Is IO 7-45 unconstitutionally overbroad?

**Issue II:** Did the suspension and training order mentioned in Issue I violate Labriola's First Amendment right to the freedom of speech?

**Issue III:** Did the suspension and training order mentioned in Issue I violate Labriola's First Amendment right to the free exercise of his religion?

**Issue IV:** Did the suspension and training order mentioned in Issue I violate Labriola's First Amendment right to the freedom of the press?

**Issue V:** Labriola declined to undergo the additional training because he believed then – and believes now – that this training would have compelled him to say things that he disagrees with on religious grounds and/or to apologize for his views. For this decision, he was fired. Did the firing violate Labriola's First Amendment rights to the freedom of speech (specifically, to the right to be free from compelled speech) and to the free exercise of his religion?

## STATEMENT OF THE CASE

<u>Course of Proceedings and Dispositions in the District Court</u>

This is a civil rights suit brought through 42 U.S.C. § 1983 to vindicate Labriola's First Amendment rights. Labriola was an employee of the County. [Doc. 46-2 p. 8]. After Labriola wrote an Opinion Piece on his own time, his boss – Jose "Pepe" Diaz, then-Chairman of the Board of County Commissioners of Miami-Dade County (hereafter, "Former Chairman Diaz") – suspended him without pay for three days and ordered him to undergo additional training. [Doc. 8-7 pp. 1-2]. Former Chairman Diaz also claimed that the Opinion Piece violated IO 7-45. *Id.* at 2. Labriola served the suspension but declined to undergo the training. [Doc. 46-1 pp. 8-9; Doc. 8-7 p. 13]. For that decision, he was fired. [Doc. 8-12]. Labriola filed suit in U.S. District Court, arguing that the County violated his First Amendment rights three times: 1) when Former Chairman Diaz suspended him, 2) when Former Chairman Diaz ordered him to undergo additional training, and 3) when Former Chairman Diaz fired him. Labriola also argued that IO 7-45 is unconstitutionally overbroad. [Docs. 1 and 8]. On September 21, 2023, the district court denied his motion for summary judgment and granted the County's motion for summary judgment on all counts. [Doc. 61]. The next day, the district court entered the final judgment, which reflected its ruling on the parties' motions for

summary judgment. [Doc. 62]. Labriola timely filed his Notice of Appeal with the district court on October 21, 2023. [Doc. 65].

Statement of Facts

Labriola is a Christian. [Doc. 8 p. 2; Doc. 15 p. 1; Doc. 46-1 p. 2]. From June 2013 through April 14, 2021, he worked for the County as a Commission Media Aide within the BCC Media Division. [Doc. 46-2 p. 8]. The BCC Media Division is within the Office of the Chair. *Id*. The Office of the Chair is within the Board of County Commissioners ("BCC"). *Id.* The BCC is the County's legislative body. *Id*. The Office of the Chair is under the purview of the BCC's chairperson. *Id.* When the events relevant to this action occurred, Labriola's boss was the BCC's then-Chairman Jose "Pepe" Diaz. [Doc. 46-1 pp. 2-3]. Labriola received excellent performance awards for being an exemplary employee. [Doc. 8-1; Doc. 46-2 p. 4]. Olga Vega – his immediate supervisor – described him as a "good person" who "was very good at what he did." [Doc. 46-3 pp. 10, 36].

Labriola was a low-level, behind-the-scenes employee. He was the lowest link in the chain of command.[2] He did not have a supervisory or policymaking role. [Doc. 46-1 p. 3; Doc. 46-3 p. 10]. He was not anyone's spokesperson. [Doc. 46-1

---

[2] The chain of command from top to bottom was: Former Chairman Diaz, Former Chairman Diaz's Chief of Staff Isidoro Lopez ("COS Lopez"), BCC Media Division Executive Director Olga Vega ("Ms. Vega," who was Labriola's immediate supervisor), and Labriola. [Doc. 46-1 p. 3].

p. 3; Doc. 46-3 pp. 17-19; Doc. 46-4 pp. 28, 37-38]. While he performed various duties, his name was not associated with them and he was not a face for anyone [Doc. 46-1 p. 3]:

1. He did not give any policy advice. [Doc. 51-2 p. 1].

2. He wrote press releases for commissioners within the confines of instructions that commissioners' staff gave him. Commissioners' staff gave him the general theme and subjected his drafts to final review before they were released to the press. His name and contact information did not appear on press releases nor was authorship attributed to him. [Doc. 46-4 pp. 24-26; Doc. 46-3 pp. 11-16; Doc. 8-2; Doc. 46-2 p. 4].

3. Press releases were not issued from his work email account but from a generic office account, bccmedia@miamidade.gov. [Doc. 46-1 p. 3; Doc. 46-3 pp. 14-15].

4. At various times throughout his tenure, he drafted messages for various commissioners under their names which were published in newsletters, brochures, and other publications, but his name did not appear in any of those messages, and authorship was not attributed to him. The commissioners and/or their staffs gave him the topic or general theme and he drafted the messages accordingly. Each message was then reviewed by the commissioner's staff for final approval, following any additional edits by the

commissioner or staff members. [Doc. 46-4 pp. 6-13, 16, 24-26, 28-30, 33, 36-41]. He did not originate the topics/themes of these writings. [Doc. 51-2 p. 3]. While his name did not appear in any of the messages that he drafted for commissioners, during the chairpersonship of Audrey Edmonson, the short-lived limited-edition quarterly *The Chamber Gazette* was produced. *Id.* at p. 2. In it, Labriola's name was listed as a "writer/copy editor," but none of the articles bore his byline, and his picture did not appear anywhere in the publication, so his name still wasn't associated with anything that was written in the name of any commissioner. *Id.* Furthermore, *The Chamber Gazette* was discontinued at the end of Edmonson's chairpersonship and Labriola's name did not appear in any subsequent County publications. *Id.*

5. Labriola worked on Former Chairman Diaz's inauguration speech for Diaz's installation as Chairman in January 2021. However, Ms. Vega gave him the outline/content of the speech, which he edited and polished. The speech was not attributed to him. [Doc. 46-4 pp. 13-16, 42-43].

6. During the chairpersonship of Audrey Edmonson (who preceded Former Chairman Diaz as the chairperson), Labriola drafted talking points for Edmonson's speeches. One of Edmonson's staff members directed what he would write for those speeches. *Id.* at pp. 30-32, 43-44.

7. Labriola did not insert his views into any of these writings. [Doc. 46-1 p. 4; Doc. 46-3 pp. 13-14].

8. As pertains to all the written content (prepared speeches included), Labriola was a scrivener who drafted written documents pursuant to instructions and the direction of his supervisors and commissioners' staff. See the preceding subparagraphs in this list.

9. He did not confer with constitutional officers to plan any public information, educational, or publicity projects. [Doc. 51-2 pp. 2-3].

10. He assisted all 13 commissioners' offices, as requested, with public records requests, either by retrieving the responsive documents or by directing requestors to another person when necessary. [Doc. 46-1 p. 4; Doc. 46-2 p. 9; Doc. 46-3 pp. 15-18].

11. He forwarded media inquiries and reporters' interview requests to one of his supervisors or to the appropriate commissioner's staff. [Doc. 51-1 p. 4; Doc. 51-3 pp. 14-15; Doc. 51-6 pp. 13-16].

12. Some weekends during the chairpersonship of Audrey Edmonson, Labriola worked at drive-through food giveaways organized by Edmonson during COVID-19. He would help set up the place and/or would be in the assembly line filling boxes of food that would be distributed to the public as they waited in their cars with their trunks popped open. Thus, his contact with the

public was minimal at these giveaways: No one in the general public knew who he was. He did not wear a name badge or give speeches. He was faceless. [Doc. 51-3 pp. 9-13; Doc. 51-2 p. 1].

13. He did not direct or plan press conferences. He only assisted as requested with some of the logistics of press conferences, like telling the cameraman where to go and set up. [Doc. 51-2 pp. 4-5].

14. Altogether, Labriola dealt minimally with the public and when it came to commissioners, he dealt almost exclusively with their staffs. *Id*. at 5.

15. On rare occasions, during the chairpersonship of Audrey Edmonson, Labriola would take pictures of Chairwoman Edmonson at some event (like pictures showing her serving food to the community) and post those pictures on her official social media. He did this only when the employee who normally handled Chairwoman Edmonson's social media was unavailable. His name and contact information did not appear on those posts. [Doc. 46-4 pp. 22-24, 41-42; Doc. 46-1 p. 4].

16. Additional details about his job are included in Doc. 51 pp. 1-2, 11-14.

Labriola has religious beliefs concerning transgender ideology, transgenderism, homosexual marriage, and Drag Queen Story Hours. [Doc. 46-1 pp. 4-5; Doc. 8 pp. 4-5]. Motivated by those beliefs, he wrote an opinion piece (the "Opinion Piece") in an online newsletter in March of 2021. [Doc. 8-3]. In it, he

characterized the "Equality Act" as "Orwellian" and discussed what he believes its negative effects would be if it is enacted into law. *Id*. He cited that the Act "has been described as 'the most comprehensive assault on Christianity ever written into law.'" *Id*. He criticized what he believes would be the Act's promotion of abortion on demand, homosexual marriage, transgenderism, gender reassignment surgery, and Drag Queen Story Hours, among other things. *Id*. He decried that the Act would destroy the free speech and free exercise rights "of anyone who dares defy the left's sexual and gender ideologies" by disagreeing with homosexuality and transgenderism – especially religious institutions, "Christian bakers," and "other honest hardworking small business owners." *Id*. He wrote the Opinion Piece on his own time (not during work hours). [Doc. 46-1 p. 5; Doc. 46-4 p. 43; Docs. 46-5 p. 4 and 46-6 (both responding to the County's request for all documents that support Labriola's allegation that he wrote the Opinion Piece on his own time)]. The Opinion Piece did not identify him as a County employee. [Doc. 46-2 p. 13].

While some might find some of what Labriola wrote offensive,[3] his words nonetheless characterized his religious and legal concerns about the Equality Act, homosexual marriage, transgenderism, and Drag Queen Story Hours. These words were written within that larger context. Such words are constitutionally-protected speech. *See Snyder v. Phelps*, 562 U.S. 443 (2011). The Opinion Piece expressed

---

[3] See pages 40-41 of this brief.

criticism, and criticism (by its nature) is not welcomed by all. However, criticism is precisely the kind of pure speech for which the First Amendment provides strong protection. *Mahanoy Area Sch. Dist. v. B.L.*, 141 S. Ct. 2038, 2047 (2021).

A stranger named Jonathan Edwards found the Opinion Piece, researched Labriola's employment, and emailed the Opinion Piece to staff from all 13 BCC commission offices on March 3, 2021. [Doc. 46-2 p. 4; Doc. 8-4; Doc. 46-1 pp. 6-7]. In a March 5 Disciplinary Action Report ("DAR"), Former Chairman Diaz suspended Labriola without pay for three days and ordered him to undergo additional training, all in retaliation for the Opinion Piece. [Doc. 8-7 pp. 1-2]. In the DAR, Former Chairman Diaz claimed that the Opinion Piece violated IO 7-45, although he never clarified in the DAR which provision(s) of that policy was/were violated. *Id*. at 2.[4] Labriola served the suspension from March 8 – 10, 2021, and returned to work on March 11. [Doc. 46-1 pp. 8-9].

Furthermore, in the DAR, Former Chairman Diaz ordered Labriola to undergo "training regarding the County's anti-discrimination policies." [Doc. 8-7 p. 2]. In his Amended Complaint, Labriola asserted – and the County agrees – that his training would have included the training program "Overview of the County's

---

[4] Although Former Chairman Diaz said in the DAR that he was punishing Labriola under IO 7-45 and other County policies, the County admitted that he punished Labriola only under IO 7-45. [Doc. 46-2 p. 15].

Anti-Discrimination Policy," also known as "IO 7-45 training."[5] [Doc. 8 p. 20; Doc. 46-8 p. 4; Doc. 46-9 p. 4; Doc. 46-10; Doc. 46-11 pp. 9-15; Doc. 46-4 p. 34]. The training module for this program tells employees who have become aware that they have "offended" someone to "**start with an apology** [and] stop the offensive behavior immediately." [Doc. 8-18 p. 25]. Labriola believed then and believes now that this training would have compelled him to say things that he disagrees with, to apologize for his views, and, thus, to violate his own deeply held religious beliefs and convictions. [Doc. 46-1 pp. 9-10]. Therefore, he declined to undergo the additional training and explained his reasons for doing so in an email to COS Lopez. [Doc. 8-7 p. 13]. For that decision, he was fired on April 14, 2021.[6]

Labriola filed this suit to vindicate his First Amendment rights to free speech, free exercise of religion, and free press.

<u>Standard of Review</u>

The standard of review for each contention is *de novo* because this Court reviews a grant of summary judgment *de novo*. *Boim v. Fulton Cnty. Sch. Dist.*, 494 F.3d 978, 982 (11th Cir. 2007).

---

[5] That does not mean that Labriola's training would not have also included the separate training program called "Transgender Sensitivity and Inclusion." [Doc. 51 pp. 9-10; Docs. 51-15 and 51-17; Doc. 51-4 pp. 6-15, 23-24].

[6] Former Chairman Diaz fired Labriola in a letter dated April 13, 2021. [Doc. 8-12]. However, Labriola did not receive this letter until nearly the end of the workday on April 14, 2021. [Doc. 46-1 p. 9].

## SUMMARY OF THE ARGUMENT

Labriola was a low-level, behind-the-scenes employee for the County. The County punished him after he wrote an Opinion Piece on his own time. The freedom of speech, the free exercise of religion, and the freedom of the press stand as fundamental liberties expressly protected under the United States Constitution. Here, the County punished a public employee for his constitutionally-protected speech, including by wielding an unconstitutionally-overbroad employment policy to suspend him and by firing him after he declined to undergo additional training which he believes would have compelled him to say things that he disagrees with and/or to apologize for his views. The district court wrongly granted summary judgment to the County on all counts. Labriola has six issues with this grant and with the district court's denial of his own motion for summary judgment.

First, the district court erred in granting summary judgment to the County on Count III. Specifically, it erred in holding that IO 7-45 is not unconstitutionally overbroad. IO 7-45 is unconstitutionally overbroad under *O'Laughlin v. Palm Beach Cnty.*, 30 F.4th 1045 (11th Cir. 2022), because it can apply to just about any expression. It can apply to just about any expression because 1) it has a broad and subjective intent, 2) it regulates the speech of both people who are County employees and of people who are not County employees, 3) it prospectively restricts County employees' speech, and 4) its provisions allow for broad and

open-ended enforcement. Therefore, IO 7-45 is unconstitutionally overbroad, both facially and as applied to Labriola. Therefore, the suspension and training order were based on an unconstitutional policy and were, thus, unconstitutional themselves. And because the training order was unconstitutional, Labriola had no duty to follow it and the County unconstitutionally fired him for not undergoing the additional training. This Court should order the district court to grant summary judgment to Labriola on Count III.

Next, the district court concluded that the suspension and training order passed the *Pickering-Connick* Test for public employee free speech, and, thus, granted summary judgment to the County on Counts I, II, IV, V, and VI. That should be reversed for four reasons. First, the district court erred in concluding that the County's efficiency interest outweighed Labriola's interest in speaking. The County cannot make that showing largely because 1) Labriola was a low-level, behind-the-scenes employee who did not work in a supervisory or policymaking role, 2) Labriola did not work for a quasi-military organization, and 3) the County could not predict a reasonable possibility of adverse harm at the time that Labriola wrote the Opinion Piece. Second, the suspension and training order were each adverse employment actions because they each were likely to chill the exercise of

constitutionally-protected speech.[7] Third, the Opinion Piece was a substantial or motivating factor for the suspension and training order.[8] And fourth, Former Chairman Diaz would not have suspended Labriola or ordered him to undergo the additional training but for the Opinion Piece.[9] Therefore, the suspension and training order violated the First Amendment under the *Pickering-Connick* Test. And since the training order was unconstitutional, the County could not then fire Labriola for declining to undergo it. Therefore, the suspension, training order, and firing were all unconstitutional. This Court should order the district court to grant summary judgment to Labriola on Counts I, IV, and VI.

Third, the district court erred in granting summary judgment to the County on Count II. It did so for two reasons. First, the district court grouped Count II together with the *Pickering-Connick*-based Counts I, IV, VI when granting the County summary judgment on each of those counts. That was an error because Count II is not based on the *Pickering-Connick* Test. The district court should have done a separate analysis of Count II. Second, the district court should not have granted summary judgment to the County on Count II because there is a good possibility that in this training session, the instructor would have pressured or

---

[7] The district court did not get to this point in the *Pickering-Connick* Test. However, Labriola makes this argument because appellate courts generally like entire issues to be briefed.

[8] *See Id*.

[9] *See Id*.

forced Labriola to apologize for his views and/or to say things that he disagrees with. This is a triable issue. This Court should remand Count II for trial.

Fourth, the district court erred in granting summary judgment to the County on Count VII. The district court granted summary judgment on Count VII largely because Labriola is not a journalist. That is an error because "freedom of the press is a 'fundamental personal right'" (*Branzburg v. Hayes*, 408 U.S. 665, 704 (1972)) and because plaintiffs who are not members of the press can still win on a freedom of the press claim. *See Lovell v. City of Griffin*, 303 U.S. 444, 451-53 (1938) (plaintiff wasn't a member of the press and still won her freedom of the press claim.) This Court should order the district court to grant summary judgment to Labriola on Count VII.

Fifth, the district court misquoted Labriola. The district court claimed that Labriola "explicitly referred to LGBTQ people…using derogatory slurs and offensive stereotypes such as 'scary-looking, child-molesting tranny' and 'flamboyant, heavily-made up pedophile in a dress.'" [Doc. 61 pp. 2-3]. The district court's characterization of Labriola's statements is, respectfully, incorrect, as the record shows.

Sixth, the County has municipal liability under 42 U.S.C. § 1983 for all three adverse employment actions taken against Labriola: the suspension, the order to undergo the additional training, and the firing. This is because all three actions

were rooted in County policy (IO 7-45) and because Former Chairman Diaz exercised final policymaking authority when he took those actions.[10]

## ARGUMENT

Labriola asks this honorable Court to reverse the district court's grant of summary judgment to the County, to grant him summary judgment on Counts I, III, IV, VI, and VII, and to remand Count II for trial.

This Court reviews a grant of summary judgment *de novo*, viewing the facts and "drawing all reasonable inferences in favor of the nonmoving party." *Boim*, 494 F.3d at 982. Summary judgment is proper only if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The Court must draw all plausible inferences and resolve all genuine factual disputes in favor of the nonmoving party. *Anderson v. Liberty Lobby*, 422 U.S. 242 (1986). The district court erred in granting summary judgment to the County for four main reasons: 1) It erred in holding that IO 7-45 is not unconstitutionally overbroad (Count III); 2) It erred in concluding that the suspension, training order, and firing passed the *Pickering-Connick* Test for public employee free speech, and, thus, in granting summary judgment to the County on

---

[10] The district court did not get to this point. However, Labriola makes this argument because appellate courts generally like entire issues to be briefed.

Counts I, II, IV, V, and VI; 3) It erred in granting summary judgment to the County on Count II because that count is not based on the *Pickering-Connick* Test; and 4) It erred in granting summary judgment to the County on Count VII. Furthermore, the district court misquoted Labriola, and the County has municipal liability under 42 U.S.C. § 1983 for all three adverse employment actions taken against Labriola.

### The District Court Erred in Holding that Miami-Dade County Implementing Order 7-45 is not Unconstitutionally Overbroad.

A public employer's employment policy may be unconstitutionally overbroad. *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 468 (U.S. 1995) ("*NTEU*"); *O'Laughlin v. Palm Beach Cnty.*, 30 F.4th 1045, 1054 (11th Cir. 2022); *Liverman v. City of Petersburg*, 844 F.3d 400, 407-411 (4th Cir. 2016). "In determining whether a public employer's policy that prospectively restricts speech is unconstitutionally overbroad, courts apply a modified version of the *Pickering-Connick* test. That test places a heavy burden on the government to 'show that the interests of [the] potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's necessary impact on the actual operation of the Government.'" *O'Laughlin*, 30 F.4th at 1054 (quoting *NTEU*, 513 U.S. at 468).

In *O'Laughlin*, two firefighters challenged a provision of their department's social media policy. *O'Laughlin*, 30 F.4th at 1049-1050. That

provision barred social media posts that "could be reasonably interpreted as having an adverse effect upon Fire Rescue morale, discipline, operations, the safety of staff, or perception of the public." *Id.* at 1049. This Court concluded that the provision suffered from "astonishing breadth" and was unconstitutionally overbroad because it could be applied to "just about anything." *Id.* at 1056.

Like the provision of the social media policy in *O'Laughlin*, IO 7-45 – under which Former Chairman Diaz suspended Labriola and ordered him to undergo training – is unconstitutionally overbroad, both facially and as applied to Labriola.[11]

IO 7-45 prospectively restricts employees' speech and restricts a substantial amount of constitutionally protected speech relative to its plainly legitimate sweep. The unconstitutionality begins with the policy's intent and scope. Its intent is to "deter conduct that is offensive, inappropriate, and demeaning before it becomes unlawful discrimination or harassment." [Doc. 8-15 pp. 1-2]. The intent provides a large scope for the content which the County believes it can regulate in the name of avoiding conduct that is "offensive." "Offensive" is subjective to the listener and is not defined in IO 7-45. IO 7-45 applies to County employees and to people who are not County employees. *Id.* at

---

[11] Although Former Chairman Diaz said in the DAR that he was punishing Labriola under IO 7-45 and other County policies, the County admitted that he punished Labriola only under IO 7-45. [Doc. 46-2 p. 15].

2, 8-9. It applies to "employees of contracted service providers, vendors…customers, and visitors, and covers their treatment of each other as well as others with whom they come into contact at County workplaces and/or at County-sponsored and/or business-related activities and events." *Id.* at 2. Thus, it regulates what two [non-employee] visitors may say to each other at a County facility (such as at a County-run public park) or at a County holiday party, for example.

Moreover, for the County to punish Labriola under IO 7-45, his actions must have qualified as "discrimination," "unlawful harassment," "awful harassment," "sexual harassment," "retaliation," or as a violation of IO 7-45's social media policy. *Id.* at 2-6. Before the summary judgment papers were filed, neither the County nor the County's witnesses identified which provision(s) of IO 7-45 the Opinion Piece allegedly violated.[12] However, the three provisions that Former Chairman Diaz most likely thought of when he punished Labriola were

---

[12] Except County witness Erin New, who claimed that the Opinion Piece violated IO 7-45's social media policy. [Doc. 46-11 p. 16]. Erin New was and is the Director of the Human Rights & Fair Employment Practices Division ("HRFEP") of the County's Human Resources Department. *Id.* at 7-8. Furthermore, the County itself did not claim that the social media policy was the provision of IO 7-45 under which Labriola was punished until it filed its summary judgment papers over two years after Labriola was punished. [Doc. 44 (County's Motion for Summary Judgment) pp. 19-20; Doc. 48 (County's Response to Labriola's Motion for Summary Judgment) p. 6]. Therefore, it is proper for Labriola and this Court to review the constitutionality of all three provisions.

those about "unlawful harassment," "awful harassment," and the social media policy.[13] All three of those provisions are unconstitutionally overbroad.

IO 7-45's definition of "unlawful harassment" includes that:

> Unlawful harassment is unwelcome conduct based on a protected class where the conduct: (1) Has the purpose or effect of creating an intimidating, hostile, humiliating, or offensive working environment; (2) Has the purpose or effect of unreasonably interfering with a person's work performance; or (3) Otherwise adversely affects a person's employment opportunities."

[Doc. 8-15 p. 5]

By defining "unlawful harassment" non-exhaustively and with terms like "*has the purpose or effect of* creating an intimidating, hostile, humiliating, or offensive work environment" and "*has the purpose or effect of <u>unreasonably interfering</u> with* a person's work performance" (Emphases added), the County can punish virtually any protected expression by its employees that it disagrees with as "unlawful harassment." That "unlawful harassment" is overbroad is reinforced by the fact that: 1) it prohibits "electronic transmission of derogatory…materials, including…social media posts."; 2) "[t]he harasser can be…someone who is not an employee of the County, such as a board member, vendor, client, or customer"; and 3) the "harm" need not be intentional. *Id*. at 3.

---

[13] That's because the Opinion Piece clearly did not qualify as "discrimination," "sexual harassment," or "retaliation" as IO 7-45 defines those terms.

"Awful harassment" is also unconstitutionally overbroad. IO 7-45 defines "awful harassment" as "conduct, though unwelcome and offensive, [that is] unrelated to any protected class and can be isolated (or infrequent) and includes, but is not limited to: occasional unwelcome compliments, questionable jokes, limited bullying, nonviolent threats, the use of profanity, and insults unrelated to any protected class." *Id*. By defining "awful harassment" non-exhaustively, the County can punish virtually any protected expression by its employees as "awful harassment."[14]

Additionally, the IO 7-45 social media policy is also unconstitutionally overbroad. It tells County employees that "[i]nappropriate postings or communication on personal social media that include discriminatory remarks, harassment, bullying, threats of violence, *or similar inappropriate* or unlawful *conduct* constitute a violation of this policy." (Emphases added). *Id*. at 6. It continues, "[e]xamples of this type of conduct might include offensive posts that disparage someone or contribute to a hostile work environment on the basis of race, color, religion, ancestry, sex, pregnancy, national origin, age, disability, marital status, familial status, gender identity, gender expression, sexual

_____

[14] IO 7-45 claims that "awful harassment" is "behavior that…falls short of a violation of this policy." *Id*. However, the County may nonetheless punish someone for "awful harassment." *Id*. at 3-4 (clarifying that "[t]he County may take necessary corrective or remedial action" against even workplace conduct which "does not constitute a violation of this policy.")

orientation, or actual or perceived status as a victim of domestic violence, dating violence or stalking, or any other category protected by local, state or federal law." *Id*. Critically, the social media policy prohibits "similar inappropriate…conduct," which is an undefined and open-ended phrase. By itself, the phrase "similar inappropriate…conduct" makes the social media policy unconstitutionally overbroad. Furthermore, the broad prohibition on "offensive posts that disparage someone" based on a variety of categories (including "gender identity") could include mere disagreement over something like gender identity. This policy is broader than the policy in *O'Laughlin*, which was limited to content that could have an adverse effect upon the workplace. *O'Laughlin*, 30 F.4th at 1049. This policy doesn't even have that limit: One can violate IO 7-45's social media policy with comments that "disparage someone." [Doc. 8-15 p. 6]. One need not "contribute to a hostile work environment…" to violate this policy. *Id*. Therefore, this policy covers a broad swath of protected expression.

In sum, the intent and scope of IO 7-45 make IO 7-45 unconstitutionally overbroad. Furthermore, each of the three provisions discussed above reaches a substantial amount of constitutionally protected speech relative to its plainly legitimate sweep. Like the social media policy in *O'Laughlin*, IO 7-45 has astonishing breadth and can be applied to just about anything. Therefore, IO 7-45 is unconstitutionally overbroad, both facially and as applied to Labriola. Therefore,

the suspension and training order were based on an unconstitutional policy and were, thus, unconstitutional themselves. And because the training order was unconstitutional, Labriola had no duty to follow it and the County unconstitutionally fired him for not undergoing the training. This Court should order the district court to grant summary judgment to Labriola on Count III.

In its Order Denying Plaintiff's Motion for Summary Judgment and Granting Defendant's Motion for Summary Judgment ("Summary Judgment Order"), the district court erroneously concluded that IO 7-45 is not unconstitutionally overbroad. First, it claimed that IO 7-45's prohibition of "discrimination," "harassment," and "[i]nappropriate postings or communication on personal social media that include discriminatory remarks, harassment, threats of violence, or similar inappropriate or unlawful conduct…are sufficiently discrete categories of speech." [Doc. 61 p. 8]. The district court contrasted these allegedly "discrete categories" with what it described as the "amorphous standard" of the policy in *O'Laughlin. Id.* at 8-9. However, as described above, those categories are anything but discrete. Second, the district court erred by comparing this case to *Doe v. Valencia Coll.*, 903 F.3d 1220 (11th Cir. 2018). [Doc. 61 pp. 8-9]. In that case, this Court upheld a provision of a college's code of conduct against an overbreadth challenge where the provision prohibited "stalking." *Doe*, 903 F.3d at 1231-33. The provision defined "stalking" as "behavior in which an individual

willfully, maliciously, and repeatedly engages in a knowing course of conduct directed at a specific person which reasonably and seriously alarms, torments, or terrorizes the person, and which serves no legitimate purpose." *Id.* at 1232. This Court held that the provision was not unconstitutionally overbroad because 1) it contained a scienter requirement and 2) it required more than a purely subjective or only minimal threshold of harm. *Id.* at 1232-33. IO 7-45 is distinct from the policy in *Doe* because neither of the three provisions in question has any scienter requirement and because the definitions of all three are purely subjective. Plus, IO 7-45 applies to a broad set of people. See pp. 11, 17-18 of this brief. Therefore, the district court erred.

### The District Court Erred in Concluding that the Suspension, Training Order, and Firing Passed the Pickering-Connick Test for Public Employee Free Speech and, thus, in Granting Summary Judgment to the County on Counts I, II, IV, V, and VI.

The district court concluded that the County's efficiency interest outweighed Labriola's interest in commenting upon matters of public concern and granted summary judgment to the County on Counts I, II, IV, V, and VI. [Doc. 61 pp. 6-8]. Contrariwise, the County cannot show that its efficiency interest outweighed Labriola's interest in speaking. Furthermore, the suspension, training order, and firing were adverse employment actions. Next, that the Opinion Piece was a substantial or motivating factor for the suspension and training order is beyond dispute. Finally, it is beyond dispute that Former Chairman Diaz would not have

suspended Labriola or ordered him to undergo the training but for the Opinion Piece. Therefore, the district court erred. This Court should order the district court to grant summary judgment to Labriola on Counts I, IV, and VI.

There is a six-step *Pickering-Connick* Test to determine whether a public employer's actions violate the Free Speech Clause. First, the employee must prove that 1) he spoke as a private citizen 2) on a matter of public concern. If the employee proves those steps, then the employer must prove that 3) its legitimate interest in promoting the efficiency of public services it performs (its "efficiency interest") outweighs the employee's interest in commenting upon matters of public concern (this step is known as the "balancing test"). If the employer proves the third step, the employer wins. If the employer fails to prove the third step, then the employee must prove that 4) the employer took an adverse employment action against the employee 5) for which the employee's speech played a substantial or motivating factor (causation). If the employee proves the fourth and fifth steps, the employer must prove 6) that it would have taken the adverse employment action even in the absence of the employee's protected speech (a.k.a. the "same decision defense"). If the employer fails to carry its burden on the sixth step, the employee wins. *Garcetti v. Ceballos*, 547 U.S. 410 (2006); *Bryson v. City of Waycross*, 888 F.2d 1562, 1565-66 (11th Cir. 1989) (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968) and *Connick v. Myers*, 461 U.S. 138 (1983)).

The only issues here are 1) whether the County can show that its efficiency interest outweighed Labriola's interest in speaking, 2) whether Labriola can show that Former Chairman Diaz took adverse employment actions against him when he suspended him, ordered him to undergo additional training, and fired him, 3) whether the Opinion Piece was a substantial or motivating factor for the suspension and training order, and 4) whether Former Chairman Diaz would have suspended Labriola or ordered him to undergo the additional training but for the Opinion Piece.[15]

### The District Court Erred in Concluding that the County's Efficiency Interest Outweighed Labriola's Interest in Speaking.

The district court concluded that this balance is in the County's favor. [Doc. 61 pp. 6-8]. However, in so doing, it erred a few times, including by ignoring critical factors in Labriola's favor.

This balance is a question of law. *Beckwith v. City of Daytona Beach Shores*, 58 F.3d 1554, 1563 (11th Cir. 1995). The burden is on the public employer to prove that its interest prevails. *Rankin v. McPherson*, 483 U.S. 378, 388, 396

---

[15] The County conceded that Labriola wrote the Opinion Piece as a private citizen. [Doc. 46-2 p. 13]. It also conceded that the Opinion Piece concerned matters of public concern, that "those statements" in the Opinion Piece played a substantial or motivating factor in the suspension and training order, and that it would not have taken those actions but for "his statements." [Doc. 44 (County's Motion for Summary Judgment) p. 11]. The district court recognized that the parties do not contest the first two steps of this analysis and went straight to the balancing test. [Doc. 61 p. 6].

(1987). The relevant factors are whether the speech "impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Id.* at 388.[16]

---

[16] It is true that "[a] public employer's 'legitimate interest in avoiding disruption does not require proof of actual disruption'" and that predicting a "'reasonable possibility of adverse harm is all that is required.'" *Snipes v. Volusia Cnty.*, 704 F. App'x. 848, 853 (11th Cir. 2017), and *Anderson v. Burke Cnty.*, 239 F.3d 1216, 1220-21 (11th Cir. 2001)). However, cases holding that the public employer predicted a reasonable possibility of disruption fall into one of four categories. Neither Labriola nor his Opinion Piece fall into any of these categories. The first category is when the public employee has a supervisory or policymaking role. *See Cochran v. City of Atlanta*, 289 F. Supp. 3d 1276, 1289-1291 (N.D. Ga. 2017) (public employee had a supervisory and policymaking role as Atlanta's Fire Chief, and the City of Atlanta showed a reasonable prediction of disruption precisely because of that role). The second category is when the public employee worked in a "paramilitary" or "quasi-military" organization that is charged with maintaining public safety and in which there is a heightened need for discipline compared to other public employees (law enforcement, fire department, and EMS). *See Millspaugh v. Cobb Cnty. Fire and Emergency Servs.*, No. 22-10132, 2022 U.S. App. LEXIS 32226, *29-*30 (11th Cir. Nov. 22, 2022) (plaintiff was a firefighter; "heightened interest" in discipline played important role in finding that the public employer predicted a reasonable possibility of adverse harm); *See also Snipes*, 704 F. App'x. at 850 (plaintiff was a police officer); *See also Moss v. City of Pembroke Pines*, 782 F.3d 613, 616 (11th Cir. 2015) (plaintiff was the city's assistant fire chief); *See also Gresham v. City of Atlanta*, 542 F. App'x. 817, 819-820 (11th Cir. 2013) (plaintiff was a police officer); *See also Cochran*, 289 F. Supp. 3d at 1289-1291 (plaintiff was Atlanta's Fire Chief). The third category is when at least part of the public employee's speech was about or directed to another public employee or member of the government. *See Waters v. Churchill*, 511 U.S. 661, 665-66 (1994) (public employee nurse complained about her supervisor and about hospital policy); *See also Connick*, 461 U.S. at 153 (public employee distributed a questionnaire to her coworkers whose purpose was to precipitate a vote of no

The balance swings in favor of a public employee despite that public

employee making "offensive" statements when he 1) does not work for a

"paramilitary" or "quasi-military" organization charged with maintaining public

safety (law enforcement, fire department, or EMS) and 2) does not work in a

---

confidence in their supervisor); *See also Green v. Finkelstein*, 73 F. 4th 1258, 1260, 1268-69 (11th Cir. 2023) (plaintiff publicly badmouthed her supervisor); *See also Millspaugh*, 2022 U.S. App. LEXIS 32226 at *29-*30 (speech was a firefighter's voice message to a city council member); *See also Snipes*, 704 F. App'x. at 850 (speech was, in part, a police officer's group text message to other police officers); *See also Gresham*, 542 F. App'x. at 819-820 (speech was a police officer's Facebook post criticizing another police officer); *See also James v. Montgomery Reg'l Airport Auth.*, No. 2:15-cv-332-MHT-GMB [WO], 2017 U.S. Dist. LEXIS 119815, *13-*15 (M.D. Ala. July 28, 2017) (plaintiff's letter attacked coworkers, supervisors, and his department). The fourth category is when the public employee's speech was about the public employer's services. *See Anderson v. Burke Cnty.*, 239 F.3d 1216, 1220-21 (11th Cir. 2001) (public employee distributed a questionnaire to political candidates concerning defendant county's emergency services); *See also Moss*, 782 F.3d 613 (plaintiff criticized the city's handling of budget and pension issues). Neither Labriola nor his Opinion Piece fall into any of these categories. Therefore, the Opinion Piece didn't give the County grounds to predict a reasonable possibility of adverse harm. The County must look elsewhere for evidence that its interest outweighed Labriola's – i.e., to evidence that Labriola's words caused actual disruption <u>and</u> that said actual disruption was sufficient to tip the balance in the County's favor. And for many of the same reasons in this paragraph, the County cannot find enough of that evidence to satisfy its burden.

It makes sense for these four categories to exist. They serve as a limit. Otherwise, a public employer could declare that it predicts a reasonable possibility of adverse harm the moment that one of its employees puts pen to paper. And it would not make sense to allow an employer to point to some actual disruption that occurred, then use that actual disruption to retroactively claim that it predicted a reasonable possibility of adverse harm when the employee's speech occurred, since that "logic" would erase the distinction between actual disruption and a reasonable prediction of disruption.

supervisory or policymaking role. *See Goza v. Memphis Light, Gas & Water Div*., 398 F. Supp. 3d 303, 310, 320-25 (W.D. Tenn. 2019) (public employee prevailed in this balance largely for these reasons despite making racially insensitive statements publicly); *See also Rankin*, 483 U.S. at 390-91 (public employee's interest prevailed despite her stated desire that then-President Reagan be assassinated because "[w]here, as here, an employee serves no confidential, policymaking, or public contact role, the danger to the agency's successful functioning from that employee's private speech is minimal.") The First Amendment protects a public employee's "vehement, caustic, and sometimes unpleasantly sharp" speech. *Stroes v. Town of Davie*, No. 18-62760-CIV-MORENO/SELTZER, 2019 U.S. Dist. LEXIS 87188, *19 (S.D. Fla. May 22, 2019) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)).

The County failed to satisfy its burden of proving that its interest prevails for several reasons:

1. Labriola's speech, as an expression of public issues, rests on the highest rung of the hierarchy of First Amendment values. *Connick*, 461 U.S. at 145. Thus, his interest in speaking was very substantial.

2. The Human Rights & Fair Employment Practices Division ("HRFEP") of the Miami-Dade County Human Resources Department "did not find any evidence to establish that [Labriola] was engaged in any harassing or

discriminatory behavior based on any protected characteristic within the workplace" after it interviewed all his coworkers in the BCC Media Division. [Doc. 8-13].

3. He was a low-level, behind-the-scenes employee, who did not work in a supervisory or policymaking role. [Doc. 46-1 p. 3; Doc. 46-3 p. 10; Doc. 51 pp. 11-14]. He did not work for law enforcement, the fire department, or EMS. [Doc. 46-2 p. 14]. The balance swings in favor of a public employee despite that public employee making "offensive" statements when he 1) does not work for a "paramilitary" or "quasi-military" organization charged with maintaining public safety (law enforcement, fire department, or EMS) and 2) does not work in a supervisory or policymaking role. *See Goza*, 398 F. Supp. 3d at 310, 320-25 (public employee prevailed in this balance largely for these reasons despite making racially insensitive statements publicly); *See also Moss v. City of Pembroke Pines*, 782 F.3d 613, 622 (11th Cir. 2015) (noting that there is "a heightened need for order, loyalty, and harmony in a quasi-military organization such as a police or fire department" compared to other public employment contexts).

4. From his return from suspension on March 11, 2021, until his termination on April 14, 2021 (inclusive), Labriola worked with others on many press releases and other assignments. [Doc. 46-1 p. 9; Doc. 46-3 pp. 19-20]. This

is further evidence that the Opinion Piece did not meaningfully disrupt Labriola's work or workplace relationships.

5. His two most immediate supervisors testified that his work was satisfactory and timely during this period. [Doc. 46-3 pp. 19-20; Doc. 46-12 p. 15].

6. Then-Commissioner Sally Heyman personally praised Labriola on March 24, 2021, for his work on a press release – long after the Jonathan Edwards email (March 3). [Doc. 8-14 p. 1].

7. In the Disciplinary Action Report, Former Chairman Diaz expressed concern about what he thought the public's perception of Labriola's speech might be. [Doc. 8-7 p. 2]. However, Former Chairman Diaz's concern about protecting the County's image or the County's bond with the public cannot justify the County's disciplinary action. The government cannot cite public perception or its bond with the public as a reason to punish an employee for his speech. *Goza*, 398 F. Supp. 3d at 319-321. The First Amendment prohibits the public from curtailing unpopular or controversial ideas with the government's help. *Id.*; *Gala v. City of New York*, 525 F. Supp. 3d 425, 431 (E.D. N.Y. 2021) (citing *Feiner v. New York*, 340 U.S. 315, 320 (1951)). Otherwise, there would be hecklers' vetoes, which are anathema to the First Amendment.

The district court concluded that "the Pickering-Connick balancing test weighs in the [the County's] favor." [Doc. 61 p. 6]. The district court erred by ignoring five critical factors which weigh in Labriola's favor. First, it ignored that Labriola's interest in speaking was substantial because the Opinion Piece was an expression of public issues. Second, it ignored that Labriola was a low-level, behind-the-scenes employee who did not work in a policymaking or supervisory role. Third, it ignored that Labriola did not work for a quasi-military organization. Fourth, it ignored the HRFEP report. Fifth, it ignored that Labriola worked on many press releases and other assignments between his return from suspension and his firing.

The district court also alarmingly claimed that "[t]he Opinion Piece also disrupted the harmony of the office; [Former Chairman] Diaz and several of [Labriola's] co-workers expressed at the minimum discomfort with and at the worst took offense at the Opinion Piece." *Id.* at 7. What this statement means is that public employees do not have any free speech rights if their words merely offend their co-workers or cause them discomfort.

The district court also erred by claiming that "the patently offensive slurs and statements in the Opinion Piece compromised Defendant's confidence in [Labriola's] ability to fulfill his role as a writer for the voice of the County." *Id*. Labriola objects to that characterization because Former Chairman Diaz's staff –

like the other commissioners' staffs – gave Labriola the general topic or theme of what to write and subjected his drafts to final review before releasing them to the public in Diaz's name. [Doc. 46-4 pp. 6-13, 16, 24-26, 28-30, 33, 36-41]. Labriola did not originate the topics/themes of those writings. [Doc. 51-2 p. 3].

The district court also erred by claiming that "[Labriola's] role as a Media Aide was indelibly compromised by the Opinion Piece" because "[Chief of Staff] Lopez testified that, as a result of the Opinion piece, County residents suffered a lack of confidence in their local government." [Doc. 61 p. 7 (citing the Deposition of COS Isidoro Lopez)]. However, respectfully, it cannot be true that Labriola's role was "indelibly compromised" by the Opinion Piece because he was a low-level, behind-the-scenes employee, who did not work in a supervisory or policymaking role. [See pages 3-7 of this brief; Doc. 46 pp. 2-4; Doc. 51 pp. 11-14]. Furthermore, COS Lopez supported that assertion only with vague assertions that some commissioners "**might** have a sensitivity toward the things that were written" and that unnamed callers were complaining about the Opinion Piece. (Emphasis added). [Doc. 51-9 p. 76]. That is insufficient support for COS Lopez's assertion.

Finally, the district court also erred by claiming that "the context within which the speech was made, published in the now-defunct online newsletter Sophie's Voice, does not weigh for or against either party." [Doc. 61 p. 7].

However, that factor weighs in Labriola's favor because that publication was an obscure publication by an obscure bookstore; he didn't publish the Opinion Piece in a popular, widely-circulated publication.

For the reasons above, the County cannot show that its efficiency interest outweighed Labriola's free speech interest. The district court erred.

<u>The Suspension and Training Order Were Adverse Employment Actions.</u>[17]

This Court has two tests for determining whether employment actions are "adverse" for purposes of a First Amendment free speech retaliation claim. First is the *Stavropoulos* test: An adverse employment action is an action that 1) alters an important condition of employment (such as compensation, title, position, or job duties) and 2) "is likely to chill the exercise of constitutionally protected speech." *Stavropoulos v. Firestone*, 361 F.3d 610, 618-20 (11th Cir. 2004). Second is the *Bennett-Bailey* test: An adverse employment action is an action that would "deter a person of ordinary firmness" from the exercise of the right at stake. *Bennett v. Hendrix*, 423 F.3d 1247, 1254 (11th Cir. 2005); *Bailey v. Wheeler*, 843 F.3d 473, 480-81, 484-85 (11th Cir. 2016). In such a case, "[the effect on freedom of speech] need not be great in order to be actionable." *Bailey,* 843 F.3d at 484-85 (internal quotation omitted).

---

[17] The district court did not get to this point in the *Pickering-Connick* Test. However, Labriola makes this argument because appellate courts generally like entire issues to be briefed.

The three-day suspension without pay was an adverse employment action under the *Stavropoulos* test. It altered important employment conditions by altering Labriola's compensation (no pay for three days) and by putting a suspension in his personnel file (thus affecting his prospects for promotion). It also chilled Labriola's exercise of constitutionally protected speech because it was a clear sign that his speech was unwelcome and that further adverse employment actions could be in store for him if he continued to speak his message.[18] Finally, a suspension without pay is an adverse employment action in the Title VII context. *Davis v. Legal Servs. Ala.*, 19 F.4th 1261, 1266 (11th Cir. 2021). Therefore, the suspension was an adverse employment action.

The training order was an adverse employment action under the *Bennett-Bailey* test. It would deter a person of ordinary firmness from continuing to exercise his or her right to free speech because it would be a clear sign that the person's speech was unwelcome and that further adverse employment actions could be in store for that person if he/she continued to speak his/her message. Furthermore, being ordered to undergo "training regarding the County's anti-discrimination policy" specifically because of speech – like Labriola (Doc. 8-7 p. 2) – would obviously give the person of ordinary firmness the impression that

---

[18] By satisfying the second element of the *Stavropoulos* test, the suspension also satisfied the *Bennett-Bailey* test. *Bell v. Sheriff of Broward Cnty.*, 6 F.4th 1374, 1379 (11th Cir. 2021).

his/her speech was considered discriminatory by his/her employer and that he/she needs to be re-trained – which is more evidence of the training order's chilling effect. Therefore, the order to undergo training was an adverse employment action.

Finally, since the suspension and training order were each adverse employment actions when viewed separately, they were adverse employment actions when viewed collectively. Therefore, the suspension and training order were adverse employment actions.

<u>The Last Two Steps of the Pickering-Connick Test</u>[19]

Fifth, that the Opinion Piece was a substantial or motivating factor for the suspension and training order is beyond dispute. [See Doc. 8-7 p. 2 (the DAR)]. And finally, it is beyond dispute that Former Chairman Diaz would not have suspended Labriola or ordered him to undergo the training but for the Opinion Piece. *See Id*. Therefore, the suspension and training order violated the First Amendment under the *Pickering-Connick* Test. And since the training order was unconstitutional, the County could not then fire Labriola for declining to undergo it. Therefore, the suspension, training order, and firing were all unconstitutional. Labriola prevails on all the steps of the *Pickering-Connick* Test.[20]

_____

[19] The district court did not get to this point in the *Pickering-Connick* Test. However, Labriola makes this argument because appellate courts generally like entire issues to be briefed.

[20] Labriola should be granted summary judgment not only on Count I, but also on his first Free Exercise claim (Count IV) and Count VI because those, too, are based

## The District Court Erred in Granting Summary Judgment to the County on Count II Because That Count is not Based on the *Pickering-Connick* Test.

The district court granted summary judgment to the County on Count II. It did so by misquoting Labriola's motion for summary judgment. It wrote:

> "[Labriola] correctly argues that [his] free exercise clause challenges should also be analyzed using the *Pickering-Connick* test under binding Eleventh Circuit precedent. *See Shahar v. Bowers*, 114 F.3d 1097, 1111 n. 27 (11th Cir. 1997). Thus, the Court's analysis here covers counts I, **II,** IV, V, and VI of the Amended Complaint, which are all based on alleged violations of the free speech and free exercise clauses of the First Amendment."

[Doc. 61 p. 6 n. 2] (Emphasis added).

However, what Labriola wrote in his Motion for Summary Judgment was that "since [Labriola] prevails in the *Pickering-Connick* Test, **he also prevails on his first Free Exercise claim (Count IV)** since that is also based on the *Pickering-Connick* Test." [Doc. 43 pp. 16-17 (citing *Shahar*, 114 F.3d at 1111 n. 27)] (Emphasis added). Labriola never argued that *all* of his Free Speech and Free Exercise challenges should be analyzed under the *Pickering-Connick* Test. That is because one of them – Count II – is not based on the *Pickering-Connick* Test. In Count II, Labriola asserts that the training would have constituted compelled speech in violation of the Free Speech Clause. [Doc. 8 pp. 18-20]. The compelled speech theory of Count II is distinct from the *Pickering-Connick* Test of Count I

---

on the *Pickering-Connick* Test. [Doc. 8 pp. 23, 26]; *Shahar v. Bowers*, 114 F.3d 1097, 1111 n. 27 (11th Cir. 1997).

and is based on *Janus v. AFSCME, Council 31*, 138 S. Ct. 2448, 2471-78 (2018),

and on *Hiers v. Bd. of Regents of the Univ. of N. Tex. Sys.*, No. 4:20-CV-321-SDJ,

2022 U.S. Dist. LEXIS 43617, *38-*43 (E.D. Tex. March 11, 2022). [Doc. 8 pp.

18-19]. Therefore, the district court erred by grouping Count II together with the

*Pickering-Connick*-based Counts I, IV, and VI. The district court should have done

a separate analysis of Count II.

<u>The District Court Erred in Granting Summary Judgment to the County on Count
II Because the County Fired Labriola for Declining to Undergo What Could Have
Been Compelled Speech.</u>

As a public employee, Labriola had a First Amendment right to decline to

undergo compelled speech. *Janus*, 138 S. Ct. at 2471-78. A public employee's

right to decline to undergo compelled speech includes a right to decline to undergo

training which would have required him to recant his beliefs and/or to affirm

beliefs that he does not hold and/or to use "preferred pronouns" or other language

to which he has a religious objection. *Hiers*, 2022 U.S. Dist. LEXIS 43617 at *38-

*43.

In the DAR, Former Chairman Diaz ordered Labriola to undergo "training

regarding the County's anti-discrimination policies." [Doc. 8-7 p. 2]. In his

Amended Complaint, Labriola asserted – and the County agrees – that his training

would have included the training program "Overview of the County's Anti-

Discrimination Policy," also known as "IO 7-45 training."[21] [Doc. 8 p. 20; Doc. 46-8 p. 4; Doc. 46-9 p. 4; Doc. 46-10; Doc. 46-11 pp. 9-15; Doc. 46-4 p. 34]. The training module for this program tells employees who have become aware that they have "offended" someone to *start with an apology* [and] stop the offensive behavior immediately." [Doc. 8-18 p. 25]. Labriola would have undergone the training remotely/virtually. [Doc. 46-4 p. 34]. Erin New or one of her staff would have been Labriola's instructor, and there would have been live interaction between Labriola and his instructor (Doc. 45-9 p. 17) as is usually the case in this training. *Id*. at 15-18. The instructor delivers and reinforces what is in the written materials. *Id*. at 14.

Given what the module says about apologizing, given the role of the instructor in this interactive training (constantly reinforcing upon Labriola what is in the module), given that Labriola was punished due to an Opinion Piece which criticized transgenderism, homosexual marriage, and Drag Queen Story Hours, and given Director New's deposition testimony, there is a good possibility that in this training session, the instructor would have pressured or forced Labriola to recant his views and/or to say things that he disagrees with. Therefore, Labriola was fired for declining to undergo training which could have been compelled speech. This is

---

[21] That does not mean that Labriola's training would not have also included the separate training program called "Transgender Sensitivity and Inclusion." [Doc. 51 pp. 9-10; Docs. 51-15 and 51-17; Doc. 51-4 pp. 6-15, 23-24].

a triable issue. Therefore, the district court erred in granting the County summary judgment on Count II. This Court should remand Count II for trial.

## The District Court Erred by Granting Summary Judgment to the County on Count VII

The district court granted summary judgment to the County on Count VII: Labriola's claim that the suspension and order to undergo additional training violated his freedom of the press. [Doc. 61 pp. 9-10]. The district court claimed that Labriola was not allowed to make a freedom of the press claim because he "does not cite any authority to support his position that a private citizen, who is not a journalist, may bring a freedom of the press claim based on one letter he submitted to a now-defunct newsletter. Neither is the Court aware of any such authority." *Id.* at 9. The district court then wrote that "[e]ven if [Labriola] could assert a freedom of the press claim under these facts, the Court is not persuaded that such claim would survive summary judgment" because "[Labriola's] alleged freedom of the press claim would not succeed where [his] other First Amendment claims fail." *Id.* at 9 n.3 (citing *Cooper v. Dillon*, 403 F.3d 1208, 1223 n.3 (11th Cir. 2005)).

The district court erred twice. First, its claim that Labriola was not allowed to make a freedom of the press claim is wrong because "freedom of the press is a '*fundamental personal right…not confined to newspapers and periodicals. It necessarily embraces pamphlets and leaflets…The press in its historic connotation*

*comprehends every sort of publication which affords a vehicle of information and opinion.*'" *Branzburg v. Hayes*, 408 U.S. 665, 704 (1972) (quoting *Lovell v. City of Griffin*, 303 U.S. 444, 452 (1938)) (Emphases added). Plaintiffs who are not members of the press can still win a freedom of the press claim. *See Lovell*, 303 U.S. at 444, 451-53 (plaintiff wasn't a member of the press and still won her freedom of the press claim.) Labriola's Opinion Piece was a vehicle of information and opinion. Second, even if Labriola's freedom of the press claim sinks or swims with his other First Amendment claims (as the district court implies),[22] it swims in this case because the other First Amendment claims succeed. Therefore, the district court erred. This Court should order the district court to grant summary judgment to Labriola on Count VII.

## The District Court Misquoted Labriola

The district court claimed that Labriola "explicitly referred to LGBTQ people…using derogatory slurs and offensive stereotypes such as 'scary-looking, child-molesting tranny' and 'flamboyant, heavily-made up pedophile in a dress.'" [Doc. 61 pp. 2-3]. The district court's characterization of Labriola's statements is, respectfully, incorrect. In his Opinion Piece (Doc. 8-3), Labriola did not refer to

---

[22] Which is a questionable contention. The First Amendment speaks separately of freedom of speech and freedom of the press, meaning that there is no constitutional redundancy there. *Houchins v. KQED*, 438 U.S. 1, 17 (1978) (Stewart, J., concurring); [Then-Supreme Court Justice] Potter Stewart, "*Or of the Press*," 26 Hastings L.J. 631 (1975).

LGBTQ people in general as child molesters or as pedophiles. When using the words "homosexual pedophile," he referred specifically to homosexual people who are Drag Queen Story Hour performers and who have generated shock over what many regard as their inappropriate sexualized interactions with children. [Doc. 51-2 p. 5]. Furthermore, the quote about "hiring the scary-looking, child-molesting tranny with a beard or being drowned in legal bills" was made in the context of a hypothetical consequence of the Equality Act, which Labriola believed could pressure employers to hire suspected sex offenders for fear of lawsuits. *Id*.

### The County Has Municipal Liability Under 42 U.S.C. § 1983 For All Three Adverse Employment Actions Taken Against Labriola: The Suspension, The Order To Undergo The Training, And The Firing.[23]

The County is not immune from a § 1983 claim. Municipal liability attaches when the plaintiff's injury arises 1) because of an official, written municipal policy, 2) because of an informal municipal custom that is so widespread it amounts to a custom or usage with the force of law, 3) through a decision of a municipal official or employee with final policymaking authority, 4) through a final policymaker's ratification of a subordinate's decision, or 5) through a failure to adequately train or supervise employees. *Hoefling v. City of Miami*, 811 F.3d 1271, 1279-1280 (11th Cir. 2016).

---

[23] The district court did not address this issue. However, Labriola makes this argument because appellate courts generally like entire issues to be briefed.

The County is liable because all three adverse employment actions were rooted in its policy, IO 7-45. Furthermore, Former Chairman Diaz exercised final policymaking authority when he took the adverse employment actions:

1. Labriola worked in the Media Division, which was within the Office of the Chair of the BCC. Former Chairman Diaz headed the Office of the Chair. [Doc. 46-2 p. 8; Doc. 46-1 pp. 2-3].

2. IO 7-45 authorized Former Chairman Diaz to take adverse employment actions against his subordinates. [Doc. 46-2 pp. 18-19].

3. The BCC Chairperson shall "supervise all persons who shall serve as employees of the entire [BCC]…" Miami-Dade County Code of Ordinances § 2-01(2)(e)

4. The termination letter was on BCC letterhead and included the County's seal. [Doc. 46-2 p. 19].

5. Former Chairman Diaz had final decision-making authority over Labriola's employment. *Id*. at 8. Labriola could not appeal his suspension or training order. *Id*. at 12; [Doc. 8-7 pp. 9, 15].

Therefore, the County is liable under 42 U.S.C. § 1983.

## CONCLUSION

This case is about freedom of speech, freedom of religion, and freedom of the press. For his protected speech, Labriola was unconstitutionally suspended and

ordered to undergo additional training. He was unconstitutionally fired for declining to undergo that training. This Court should reverse the grant of summary judgment to the County on all counts. This Court should then grant summary judgment to Labriola on Counts I, III, IV, and VI, and should remand Count II for trial.

DATED this 4th day of December, 2023.

Respectfully submitted,

/s/ Alexander Bumbu
Alexander Bumbu
Florida Bar No. 1024989
Southern District of Florida Bar No. 1024989
**PACIFIC JUSTICE INSTITUTE**
1021 Ives Dairy Rd.
Bldg. 3, Ste. 115
Miami, FL 33179
Tel: (786) 496-3946
Email: abumbu@pji.org
No facsimile number
*Counsel for Appellant*

**CERTIFICATE OF COMPLIANCE**

This document complies with Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 10,368 words. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally-spaced typeface using Microsoft Word in Times New Roman 14-point font.

/s/ Alexander Bumbu
Attorney for Appellant John F. Labriola

# CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of December, 2023, I filed a true and accurate copy of the foregoing document with the Clerk of Court using the CM/ECF system, which automatically sends an electronic notification to all counsel of record.

/s/ Alexander Bumbu

## SERVICE LIST

Alexander Bumbu
Florida Bar No. 1024989
Southern District of Florida Bar No. 1024989
**PACIFIC JUSTICE INSTITUTE**
1021 Ives Dairy Rd.
Bldg. 3, Ste. 115
Miami, FL 33179
Tel: (786) 496-3946
Email: abumbu@pji.org
No facsimile number
*Counsel for Appellant*

William X. Candela
Assistant County Attorney
Florida Bar No. 759317
Southern District of Florida Bar No. 759317
**Miami-Dade County Attorney's Office**
Stephen P. Clark Center
111 N.W. 1st St.
Ste. 2810
Miami, FL 33128
Tel: (305) 375-5151
Fax: (305) 375-5634
Email: wxc@miamidade.gov
*Co-Counsel for Appellee*

Andrea S. de Oña
Assistant County Attorney
Florida Bar No. 1019568
Stephen P. Clark Center
111 N.W. 1st St.
Ste. 2810
Miami, FL 33128
Tel: (305) 375-1351
Fax: (305) 375-5611
Email: andrea.deona@miamidade.gov
*Co-Counsel for Appellee*