United States Court of Appeals
For the Eleventh Circuit

**John Labriola**

*Plaintiff/Appellant,*

—*v.*—

**Miami-Dade County,**

*Defendant/Appellee.*

On Appeal from the United States
District Court for the Southern District of Florida

**Appellee's Answer Brief**

GERALDINE BONZON-KEENAN
Miami-Dade County Attorney
Stephen P. Clark Center
111 N.W. 1st Street, Suite 2810
Miami, Florida 33128
(305) 375-5151

WILLIAM X. CANDELA
Assistant County Attorneys
Counsel for Appellee

## Corporate Disclosure Statement

This appeal involves a governmental defendant, Miami-Dade County, which is a political subdivision of the State of Florida. There are no parent companies, subsidiaries, or affiliate companies that have issued shares to the public.

## Certificate of Interested Parties

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1, Appellee Miami-Dade County hereby certifies that the following persons and entities may have an interest in the outcome of this case:

1. Bumbu, Alexander – Counsel for Appellant

2. Candela, William X. – Assistant Miami-Dade County Attorney and counsel for Appellee

3. de Oña, Andrea – Assistant Miami-Dade County Attorney and counsel for Appellee

4. Huck, Hon. Paul C. – Senior United States District Judge

5. Labriola, John – Appellant

6. Miami-Dade County – Appellee

7. Miami-Dade County Attorney's Office – Counsel for Appellee

8. Pacific Justice Institute, Inc.

*/s/ William X. Candela*

William X. Candela
Assistant County Attorney
Counsel for Miami-Dade County

## Statement Regarding Oral Argument

Appellee, Miami-Dade County, does not request oral argument.

# Table of Contents

**Page**

Corporate Disclosure Statement........................................................................C1

Certificate of Interested Parties ....................................................................C1

Statement Regarding Oral Argument..............................................................i

Table of Contents ............................................................................................ ii

Table of Citations ........................................................................................... iii

Statement of Jurisdiction ................................................................................1

Statement of the Issue .....................................................................................2

Standard of Review..........................................................................................3

Summary of the Argument ..............................................................................4

Statement of the Case ......................................................................................7

Argument .........................................................................................................20

   I.   The District Court's Order Should be Affirmed Because Chairman Diaz's Interest in Advancing the County's Mission Outweighed Labriola's Interest in Making Discriminatory Remarks About the Community ........................21

   II.   Appellant's Claimed Error on Count II Was Not Raised Below .................38

   III.  The District Court Properly Granted Summary Judgment as to Count III's Overbreadth Claim Because IO 7-45 is Not Unconstitutionally Overbroad ........................................................................................40

   IV.  The Press Claim in Count VII Also Fails....................................................45

Conclusion........................................................................................................46

Certificate of Compliance...............................................................................47

Certificate of Service.......................................................................................47

**Table of Citations**

| Case | Page(s) |
|------|---------|

*Anderson v. Burke County,*
239 F. 3d 1216 (11th Cir. 2001) ........................................................................22

*Arnett v. Kennedy,*
416 U.S. 134 (1974)............................................................................................43

*Bostock v. Clayton County,*
140 S. Ct. 1731 (2020).......................................................................................25

*Bourgeois v. United States Coast Guard et al.,*
151 F. Supp. 3d 726 (W.D. La. Dec. 17, 2015)..................................................37

*Branti v. Finkel,*
100 S.Ct. 1287 (1980)........................................................................................30

*Broadrick v. Oklahoma,*
413 U.S. 601 (1972)...........................................................................................41

*Burns v. City of Utica,*
590 Fed. Appx. 44 (2nd Cir. 2014)....................................................................37

*Connick v. Myers,*
461 U.S. 138 (1983).................................................................................... 22, 28

*Cooper v. Dillon,*
403 F.3d 1208 ....................................................................................................45

*Crawford v. Fairburn, GA.,*
482 F.3d 1305 (11th Cir. 2007) .........................................................................41

*Dartland v. Metropolitan Dade County*,
   866 F.2d 1321 (11th Cir. 1989) ...................................................... 24, 30

*Depree v. Thomas*,
   946 F.2d 784 (11th Cir. 1991) ...............................................................39

*Duffy V. McPhillips*,
   276 F.3d 988 (8th Cir. 2002) ................................................................37

*Esfeller v. O'Keefe*,
   391 Fed. Appx. 337 (5 Cir. 2010)..........................................................43

*Faulkner v. Univ. of Cincinnati*,
   *et al.*, 2015 WL 1299283 (S.D. Ohio March 23, 2015)........................37

*Fiedor v. Fla. Dept. of Fin. Serv., et al.*,
   440 F.Supp 3d 1303 (N.D. Fla. Feb. 24, 2020) ....................................33

*Frank v. Montgomery*,
   679 Fed. Appx. 828, (11th Cir. 2017)....................................................23

*Freeman v. Rochester Psychiatric Center*,
   2017 WL 4169336 (W.D. N.Y. Sept. 20, 2017)....................................37

*Hansen v. Soldenwagner*,
   19 F.3d 573 (11th Cir. 1994) ................................................................23

Kennedy v. Jasper,
   928 So.2d 395 (M. Ct. App. 1995) ........................................................20

*Labriola v. Miami-Dade County*,
   2023 WL 6456525 (S.D. Fla. September 21, 2023)...............................18

*Little v. JB Pritzker for Governor et al.,*
   2021 WL 3666429 (N.D. Ill. Aug. 13, 2021) ........................................................37

*Lucorto v. Giuliani,*
   447 F.3d 159 (2d Cir. 2006) ...............................................................23

*Maddox v. Bennett,*
   2023 WL 2727540 (M.D. Ga. March 30, 2023)..................................................36

*McCullar v. Maloy,*
   369 F. Supp. 3d 1230 (M.D. Fla. 2019)....................................................... 23, 28

*McKinley v. Kaplan,*
   262 F.3d 1146 (11th Cir. 2001) ........................................................ 3, 21, 27, 31

*Mclullars v. Maloy,*
   369 F. Supp. 1230 (M.D. Fla. 2019)....................................................27

*Millspaugh v. Cobb County Fire Emergency Services,*
   2022 WL 17101337 (11th Cir. 2022) ................................................30

*Moore v. City of Roswell, Ga.,*
   2023 WL 6370626, (N.D. Ga. July 6, 2023) ........................................................45

*Morales v. Stierbeim,*
   848 F. 2d 1145 (11th Cir. 1988) .........................................................21

*Moss v. City of Pembroke Pines,*
   782 F.3d 613 (11th Cir. 2015) .............................................................27

*Munroe v. Central Bucks School Dist.,*
   805 F.3d 454 (3d Cir. 2015) ...............................................................23

*O'Laughin v. Palm Beach County*,
  30 F.  (11th Cir. 2022) ....................................................... 42, 43, 44, 45


*Patrick v. City of Port St. Lucie*,
  2007 WL 9702580 (S.D. Fla. Dec. 4, 2007)..........................................36


*Pickering v. Bd. of Educ.*, 205,
  391 U.S. 563 (1963)...............................................................21


*Rankin*,
  483 U.S. at 388, 107 S.Ct. 2891 ................................................. 26, 27

*Sims v. Metropolitan Dade County*,
  972 F. 2d 1230 (11th Cir. 1992) .....................................................4, 31


*Snipes v. Volusia County*,
  704 Fed. Appx. 848 (11th Cir. 2017)................................................. 5, 20, 22, 28


*Soloski v. Adams, et al.*
  600 F. Supp. 2d 1276 (N.D. Ga. March 2, 2009) ........................................ 35, 36


*Stavropoulos v. Firestone*,
  361 F.3d 610 (11th Cir. 2004) ..................................................... 39, 40


*Thaeter v. Palm Beach County Sheriff's Office*,
  444 F.3d 1342 (11th Cir. 2006) ................................................... 34, 35

*Tracy v. Florida Atlantic University*,
  980 F.3d 799 (11th Cir. 2020) .......................................................5

*United States v. Fleury,*
  20 F.4th 1353 (11th Cir. 2021) ......................................................41

*United States v. Hall*,
  714 F.3d 1270 (11th Cir. 2013) ......................................................3

*United States v. Hansen*,
    233 F.R.D. 665 (S.D. Cal. Oct. 28, 2005) ............................................................34

*United States v. Williams*,
    553 U.S. 285 (2008).......................................................................................43

*Vega v. Miller*,
    273 F.3d 460 (2d Cir. 2001) ........................................................................41

*Waters v. Churchill*,
    511 U.S. 661 (1994).....................................................................................28

*Zdunski v. Erse 2, et al.*,
    2022 WL 816010 (W.D. N.Y. Feb. 16, 2022).............................................39

## Table of Citations

### Statutes

28 U.S.C. § 1291 ............................................................................................1

42 U.S.C. § 1983 ..........................................................................................16

## Table of Citations

### Rules

Eleventh Circuit Rule 26.1-1 .......................................................................C1

Federal Rule of Appellate Procedure 26.1 ..................................................1,

FED. R. APP. P. 32(a)(5) ..............................................................................47

FED. R. APP. P. 32(a)(6) ..............................................................................47

FED. R. APP. P. 32(a)(7)(A) .............................................................47

FED. R. APP. P. 32(a)(7)(B)(iii) ......................................................47

## Statement of Jurisdiction

This appeal comes to this Court following the District Court's Order granting summary judgment in Appellee Miami-Dade County's favor on all counts of the Amended Complaint, and the District Court's Order denying Plaintiff's motion for summary judgment on Counts I, III, IV and VI. This Court has jurisdiction under 28 U.S.C. § 1291.

## Statement of the Issue

The issue is whether the Appellant demonstrated that the District Court erred in granting Appellee's summary judgment motion where the elected Chair of the County Commission suspended a Media Aide for a mere three days because the Media Aid referred to whole segments of the community as pedophiles and child molesters and then dismissed the Media Aide when he repeatedly refused direct orders to schedule anti-discrimination training?

## Standard of Review

The standard of review for this appeal of the District Court's order granting summary judgment to the Appellee Miami-Dade County is *de novo*. *McKinley v. Kaplan*, 262 F.3d 1146, 1149 (11th Cir. 2001). The Court may also affirm for any reason supported by the record, even if not relied upon by the district court." *United States v. Hall*, 714 F.3d 1270, 1271 (11th Cir. 2013).

# Summary of Argument

In this First Amendment retaliation case, Appellant John Labriola ("Labriola") a Media Aide for Jose "Pepe" Diaz, the Miami-Dade County Chairman for the Board of County Commissioners ("Chairman Diaz"), referred to homosexuals as "flamboyant, heavily made up pedophile in a dress" and transgender individuals as "scary looking child molesting tranny[s]" in an online article ("Opinion Piece") he authored. County Commissioners, County staff, County residents and an article in the Miami Herald newspaper condemned Labriola's offensive statements and questioned whether those statements were representative of the County's view of the community.

Chairman Diaz reviewed Labriola's Opinion Piece and determined that Labriola's slurs were offensive and inconsistent with his Media Aide duties. Based solely on these patently offensive statements, Chairman Diaz suspended Labriola for three days. Then Labriola repeatedly refused direct orders to schedule – let alone attend – the County's mandatory anti-discrimination training.

Because Labriola referred to whole segments of society as pedophiles and child molesters - the most vile of insults - in an online publication, Labriola's "speech" warranted little First Amendment protection. *Sims v. Metropolitan Dade County*, 972 F. 2d 1230, 1233 (11th Cir. 1992) (affirming summary judgment and

three day suspension in First Amendment retaliation case because plaintiff's statements "by alienating some members of Miami's community, undermine(d) the Department's ability to accomplish this purpose").

This is particularly true for Labriola, who served in a sensitive position as a Media Aide writing speeches and press releases for County commissioners earning an annual salary of $70,000.00 dollars. What is more, Plaintiff's slurs disrupted and threatened to disrupted the Office of the Chair's functions and the community. *Snipes v. Volusia County*, 704 Fed. Appx. 848, 852 (11th Cir. 2017) ("courts have routinely afforded substantial deference to public employers when disciplining an employee whose speech threatens to disrupt efficient functioning of … employee's department…").

Commissioner Diaz properly exercised his discretion in suspending Labriola for three days. Commissioner Diaz also gave Labriola a direct order to schedule and attend anti-discrimination training. Labriola's response to a simple order to schedule a training session was defiance. Labriola was given multiple chances to comply. Instead of sending a simple email scheduling the training which was to be held remotely, Labriola and repeated refused to comply with the simple order to schedule a training session. Labriola's response was insubordinate and grounds for dismissal. Thus, Labriola was terminated for a legitimate reason unrelated to his speech or religion. *Tracy v. Florida Atlantic University*, 980 F.3d 799 (11th Cir. 2020)

(affirming summary judgment on First Amendment retaliation claim because defendant terminated plaintiff for insubordination and not because of plaintiff's blog speech). According to the District Court's Order granting the County's motion for summary judgment and denying Labriola's motion for summary judgment should be affirmed.

# Statement of the Case

Appellee Miami-Dade County (the "County") is a political subdivision of the State of Florida. [ECF 42 ¶ 1]. The County is governed by a 13-member Board of County Commissioners ("BCC") representing different County districts and a mayor. *Id.* ¶ 2. The BCC Chairperson is elected by at least seven commissioners every two years.

The BCC Chairperson is the head of the Office of the Chair ("OC"). *Id.* The OC is comprised of seven divisions including the Media Division. The Media Division is responsible for communicating the BCC's policy to the public through speeches, press releases and social media. *Id.* ¶ 3.

## Commissioner Jose "Pepe" Diaz Is Elected BCC Chairman

In November 2020, BCC members elected Commissioner Jose "Pepe" Diaz to serve as the BCC Chairman. *Id.* ¶ 9. Beginning on January 1, 2021, Chairperson Diaz presided over BCC meetings, appointed the Chairperson and vice-Chairperson on all BCC committees, administered the BCC budget, and performed the other responsibilities listed in BCC rules. *Id* .¶10. Chairman Diaz was responsible for hiring and firing all OC employees. *Id.* ¶ 10. OC employees serve "at will" and are exempt from the County's civil service rules. *Id.* ¶ 11.

**Appellant John Labriola**

The County hired Labriola in 2013. *Id.* ¶ 16.   From June 2013 through April 2021, Labriola worked as a Media Aide within the Media Division.  *Id*.  In January 2021, Labriola reported to Media Division Executive Director Olga Vega ("Vega"). Vega reported to Chief of Staff Isidoro Lopez ("Lopez").  *Id.* ¶ 17.  Lopez reported to Chairman Diaz. Chairman Diaz could terminate Labriola with or without cause. In 2021, Labriola earned an annual salary of about $70,000.00.  [*Id.* ¶ 19].

**Labriola's Media Aide Duties**

A Media Aide is responsible for writing speeches, press releases and social media posts for the BCC and individual County Commissioners. *Id.* ¶ 5, 20.  As set forth in the job description, a Media Aide performs "journalistic and public relations work in developing and maintaining an extensive program of public information, publicity and news writing for the members of the Board of County Commission. *Id.* ¶ 6.

Additionally, a Media Aide "originates and writes releases and news articles for release to newspapers, radio and television broadcasters, periodicals and other publications" and "confers with and *advises* constitutional officers regarding the adaption of publicity projects and preparation of data for use in special reports and publications …".  *Id.* ¶ 7 (emphasis added). A Media Aide's work is

confidential because "certain commissioners did not want other [commissioners'] offices to get their press releases." [ECF 45 ex. 5 Vega dep. p. 38 l. 6-13].

As a Media Aide, Labriola communicated the commissioners' message by writing press releases, speeches and news articles. *Id.* ¶ 20. According to Labriola, he was a "wordsmith" responsible for "crafting messages based upon what … I was given and making it sound good. And also taking legislation and being able to convert into language that was relatable to the public." *Id.*

As a Media Aide Labriola had contact with the public while attending community events. Additionally, Labriola also spoke with reporters and arranged interviews. *Id.* ¶ 20.

In 2021, Labriola collaborated with Vega in drafting Chairman Diaz' speech for the Chairmanship induction ceremony. Labriola also created Chairman Diaz' quotes for press releases.

Q. (Mr. Bumbu) Okay. But would Mr. Labriola insert his views into the press releases?

A. (Ms. Vega) I mean, he would come up with quotes for the commissioner. He did that for [Chairman] Diaz many times.

*Id.* ¶ 20.

**Labriola Calls Whole Segments of the Community Pedophiles and Child Molesters**

In March 2021, Labriola published an article in the on-line newsletter "Sophie's Voice." In this article, Labriola wrote and published the following sentences:

> "It's going to be a choice of either baking that sodomy cake and hiring the scary looking **child molesting tranny** with a beard or being drowned in legal bills."

> No conservative small town in the South or Midwest will be safe from that weird study in perversity known as Drag Queen Story, in which public libraries host a heavily made-up, flamboyant, **homosexual pedophile in a dress who rolls around the floor with little children** as he read them stories about gender fluidity and LGBT unicorns."

*Id.* ¶ 26. [ECH 42 Ex. 11]. Labriola's name and photograph are attached. *Id.*

**The Reaction to Labriola's Slurs**

On March 3, 2021, County resident Jonathan Edwards sent an email to all 13 Commissioners and the Mayor's Office complaining of Labriola's Opinion Piece. [ECF 42 ¶ 28]. In his email, Edwards stated:

> "I am unfortunately writing this letter to you due to concern about an employee of yours that has publicly displayed some ignorant, bigoted views. He is John Labriola, one of your media Aides … "I came across an article that is **highly offensive** to people of the LGBTOIA + community … And it is mainly about concern that this person represents our County leadership **in a role as your voice to us residents** … I can't believe that this acceptable behavior for a County employee of our Miami-Dade Board of Directors."

(emphasis added).

On March 3, 2021, Maggie Fernandez, Chief of Staff for County Commissioner Eileen Higgins, complained to Vega about the offensive words in the Opinion Piece. [ECF 42, ¶ 30].

**Miami Herald Publishes Article Concerning Labriola's Slurs**

On March 5, 2021, the Miami Herald published an article entitled, "A Miami-Dade government employee wrote a slur-laden tirade against transgender people." *Id.* ¶ 31. The article further stated, "(a)n employee of the Miami-Dade County Board of County Commissioners [Labriola] wrote an opinion piece in a local newsletter where he went on a tirade against transgender individuals, using derogatory phrases like 'tranny tyranny' and "homosexual pedophile in a dress." *Id.* ¶ 32.

On March 5, 2021, Orlando Gonzales ("Gonzales"), the Executive Director of SAVE Inc. sent a letter to all 13 Commissioners and the Mayor's office complaining about the slurs in the Opinion Piece. [*Id.* ¶ 33]. In his letter, Gonzales cited to the Miami Herald article, and wrote "(t)hrough his [Labriola's] statements, he demonstrates that he is unfit for a role in government as a civil servant in service to the residents of the County …" [*Id.* ¶ 24].

**Chief of Staff Lopez Finds Labriola's Statements Offensive**

Lopez found Labriola's statements referring to homosexual and transgender individuals as pedophiles and child molesters in the Opinion Piece offensive.

Q. (Mr. Bumbu) … what language in the opinion piece did you find defamatory?

A. (Mr. Lopez) Referring **to people as pedophiles** which I think is the most offensive thing you can say about a person, let alone a subset of folks. Referring to **people as child molesters…"**

*Id*. (emphasis added) *Id.* ¶ 37.

**Labriola's Slurs Upset Chairman Diaz**

Chairman Diaz was offended by and upset with the two statements in Labriola's Opinion Piece referring to homosexuals and transgender individuals as pedophiles and child molesters.

> Q.    (Mr. Bumbu) So did the [Labriola] Opinion Piece upset you?
>
> A.    (Chairman Diaz) Yeah, it – it did.  The part really about … calling homosexual child molesters, pedophiles yea … that part got to me.

**Chairman Diaz Receives Complaints Concerning Labriola's Offensive Statements**

From March 3 through March 5, 2021, Chairman Diaz received numerous calls from Commissioners complaining of Labriola's offensive words and slurs.  For example, Commissioner Javier Souto called Chairman Diaz and said that he was "really upset about the child molestation and predatory thing that Mr. Labriola brought out." During this period, Commissioner Diaz was involved with the fallout related to the Labriola's Opinion Piece and was unable to perform work on some County related matters.

From March 3 through March 5, 2021, OC activities were impaired because the OC was responding to a "barrage of phone calls" from County residents concerning Labriola's slurs.  These two days were "chaotic and hectic" days for the

OC Media Division in that Vega received numerous calls from County residents complaining of Labriola's slurs.

**Chairman Diaz Issues Labriola a Disciplinary Action Report**

Chairman Diaz concluded that Labriola's derogatory slurs were disruptive and contrary to the BCC's mission. Chairman Diaz, however, did not object to the remainder of the Opinion Piece. Additionally, Chairman Diaz found that the slurs negatively impacted the BCC's reputation, as well as his reputation as BCC Chairman because Labriola reported to him. *Id.* ¶ 46. Consequently, on March 5, 2021, Chairman Diaz directed Lopez to draft a Disciplinary Action Report ("DAR"). *Id.* ¶ 47.

As directed, Lopez drafted the DAR. [*Id.* ¶ 48]. Lopez purposely refrained from mentioning the offensive statements in the DAR because he did not want to repeat such vile and vulgar statements in a public document. *Id.* ¶ 49.

On March 5, 2021, Chairman Diaz reviewed, signed and issued Labriola the DAR resulting in a three-day suspension.[1] In the DAR, Chairman Diaz stated Labriola's offensive statements constituted conduct unbecoming of a County employee:

> I recently read a comment article that you wrote expressing your concerns about the U.S. Congress passing a proposed law called the Equality Act. **Your article went well beyond discussing the policy**

---

[1] Labriola served the three-day suspension without pay from March 8-10, 2021.

**implications of the law. Instead, you made several inflammatory
and insulting statements that are offensive to the community we
both serve.** Let there be no doubt, these insulting statements are
unacceptable.

In your position as a Media Aide for the Board of County
Commissioners, you are responsible for drafting and communicating
this Board's policies in an effective and positive manner to this
County's diverse population. **Publishing insulting language that
attacks people based on gender identity and sexual orientation is
inconsistent with your position as a Media Aide where you are
tasked with communicating this Board's policy objectives to the
community.** At a minimum, this article exhibited poor judgment that
reflects negatively on your work in public relations on behalf of the
County.

*Id.* ¶ 51 [ECF 45 Ex. 17] (emphasis added).

Furthermore, Chairman Diaz made clear in the DAR that he suspended
Labriola for three independent reasons. First, Labriola "made several inflammatory
statements that are offensive to the community we serve." Second, the insulting
statements are also inconsistent with IO 7-45. *Id.* Third, "(p)ublishing insulting
language that attacks people based on gender identity and sexual orientation is
inconsistent with your position as a Media Aide … ." *Id.* Chairman Diaz found that
this was conduct unbecoming of a County employee. *Id.*

Finally, Chairman Diaz directed Labriola to attend "training regarding the
County's anti-discrimination policies." *Id.* Chairman Diaz directed Labriola to
"contact the Human Resource Department within the next 7 days to schedule the
training. I expect you to have completed this training within the next 30 days." *Id.*

The training identified by Chairman Diaz in the DAR is training on the County's anti-discrimination policy, Implementing Order ("IO") 7-45. [ECF 42 ¶ 12]. Pursuant to IO 7-45, "inappropriate postings or communication on personal social media that includes discriminatory remarks … or similar inappropriate or improper conduct constitutes a violation of this policy … Example of this type of conduct might include offensive posts that disparage someone … on the basis of … sex … gender identity, gender expression, sexual orientation …" . *Id.* ¶ 13.

IO 7-45 training is mandatory for all County employees. *Id.* ¶ 14. IO 7-45 remote training consists of a two-hour live virtual training which includes PowerPoint slides contained in a 13-minute video located on the Miami-Dade County e-learning platform. *Id.* ¶ 15.

**March 17, 2021, Order Directing Labriola to Schedule Training.**

By March 17, 2021, Labriola had not complied with the direct order to schedule training as directed in the DAR. *Id.* ¶ 52. Consequently, on March 17, 2021, Lopez informed Labriola that "(p)ursuant to the Disciplinary Action Report, you were instructed to contact the Human Resource Representative within 7 days in order to schedule training on the County's anti-discrimination policy. As such, you are directed to contact Elda Green by 5 p.m. Friday, March 19, 2021." *Id.* ¶ 56. Labriola did not contact Elda Green by 5:00 p.m. on March 19, 2021. *Id.* ¶ 57.

In response to Labriola's refusal to comply with the direct order, Lopez gave Labriola another chance to comply and directed Labriola to "contact Elda Green by 4:00 pm tomorrow Friday, March 26, 2021" by sending her an email … providing her with a proposed date for the training … using remote technology. *Id.* ¶ 59. Labriola did not contact Elda Green by 4:00 p.m. on March 26, 2021. *Id.* ¶ 59.

On March 29, 2021, Lopez informed Labriola that "IO 7-45 was the subject of the training you have been ordered to complete." *Id.* ¶ 60. Additionally, Lopez stated that "(r)ight now, what needs to happen is you need to send me an email by 4 pm today to schedule this training …" *Id.* ¶ 61. Labriola did not comply with the direct order and did not send an email by 4:00 p.m. on March 29, 2021, to schedule training. *Id.* ¶ 62.

**Labriola Refused to Comply With a Direct Order to Schedule Training**

Labriola refused to comply with the DAR and the three subsequent emails giving him a direct order to contact Elda Green and schedule IO 7-45 training. *Id.* ¶ 63. At the time Labriola chose to defiantly refuse to comply with these direct orders to schedule IO 7-45 training in March 2021, Labriola had no knowledge as to the content of IO 7-45 training. *Id.* ¶ 64.

> Q.	(Mr. Candela) … I know that you were ordered to take IO 7-45 training and it was to be done remotely, correct?
>
> A.	(Mr. Labriola) That was my understanding via computer.

* * *

Q.    (Mr. Candela) Right.  And in fact, the training is a passive learning experience, correct?

A.    (Mr. Labriola) That –

Mr. Bumbu – objection …

(Mr. Labriola)    I don't know if it [the training] is passive [learning experience].  I don't know.

**Q.    (Mr. Candela) Okay.  And you don't know because you did not do the training?**

**A.    (Mr. Labriola) That's correct.**

Labriola had no basis to believe that the training included compelled speech because he did not know if the training was passive or not.  Labriola became aware of IO 7-45's training content well after his dismissal. *Id.* ¶ 65.  Indeed, Labriola first learned of IO 7-45's content after he reviewed "some of the discovery for this case." *Id.* ¶ 65.

**Chairman Diaz Dismisses Labriola for Insubordination**

On April 13, 2021, Chairman Diaz dismissed Labriola's employment.  In his termination letter, Chairman Diaz noted that Labriola did not comply with the direct orders to contact the HR department and schedule a date and time for a training session regarding the County's anti-discrimination policy. IO 7-45.  *Id.* ¶ 67.

"… in written communication on March 17, March 25 and March 29, 2021 you were reminded of the March 5 order and provided with additional deadlines to complete the simple task of sending an email to schedule the required training session.  It has been more than 30 days since the March 5 order … to take the simple action of sending an email

to schedule this mandated training regarding County policy … **Your repeated refusal to comply with this simple order to scheduling training is unacceptable and insubordinate. Therefore, you are hereby dismissed from County employment effective immediately**."

*Id*. (emphasis added) [ECF 45 Ex. 21].

Labriola admits that "he used some words that some people might find offensive or provocative" in his Opinion Piece. [ECF 9 ¶ 93]. To date, Labriola stands by every word in his Opinion Piece.

> Q.    (Mr. Candela) Okay. You stand by every word that you wrote in this column, correct?
>
> A.    (Mr. Labriola) Yes.

[ECF 45 Labriola dep. p. 75 l. 21-23].

**The District Court's Order Granting Summary Judgment**

The District Court granted the County's summary judgment on all counts and denied Labriola's motion for summary judgment. *Labriola v. Miami-Dade County*, 2023 WL 6456525 (S.D. Fla. September 21, 2023). The District Court found that the Opinion Piece "expressed additional views, which are the crux of this case, that went beyond legislative acts. Plaintiff explicitly referred to LGBTQ people – the minority group that the Equality Act would protect – using derogatory slurs and offensive stereotypes such as "scary – looking, child molesting tranny" and "flamboyant, heavily-made up pedophile in a dress." *Id*. *1. The District Court also found that "a barrage of phone calls from concerned County residents about the

article and media reporters interfered with the County's ability to carry out its typical governmental duties from at least March 3, 2021 through March 5, 2021." *Id*. * 2.

Based, in part, on the findings, the District court concluded that the "*Pickering-Connick*" balancing test weights in Defendant's favor … Crucially, Plaintiff's role as a Media Aide was indelibly compromised by the Opinion Piece – Lopez testified that, as a result of the Opinion Piece, County residents suffered a lack of confidence in their elected local government …" Accordingly, the Court affords strong consideration to the fact that the patently offensive slurs and statements in the Opinion Piece compromised Defendant's confidence in Plaintiff's ability to fulfill his role as a writer for the voice of the County. *Id*. * 3. This appeal ensued.

# ARGUMENT

I. **The District Court's Order Should Be Affirmed Because Chairman Diaz's Interest in Advancing the County's Mission Outweighed Labriola's Interest in Making Discriminatory Remarks About the Community**

### a. District Court Properly Applied *Pickering-Connick* Test

At its core, this case turns on Labriola's extraneous statement in an online publication specifically referring to entire segments of the community as pedophiles and child molesters. As the District Court cogently stated: "Plaintiff also expressed additional views, which are at the crux of this case, that went beyond legislative acts. Plaintiff expressly referred to LGBT people … using derogatory slurs and offensive stereotypes such as 'scary-looking, child molesting tranny" and "flamboyant heavily made up pedophile in a dress." *Id.*\*1. There are few accusations more damaging or harmful to [one's] reputation than being called a sex offender or child molester." *Kennedy v. Jasper,* 928 S.W.2d 395, 400 (Mo. Ct. App. 1996). Based solely on these two "patently offensive slurs," *Id.*\*3. Chairman Diaz suspended Plaintiff for a mere three days. The District Court's conclusion that Labriola's three-day suspension did not violate the First Amendment, is consistent with Eleventh Circuit precedent and should not be disturbed.

It is well settled that "(a) public employer can not retaliate against a public employee for engaging in free speech under the First Amendment." *Snipes v. Volusia County*, 704 Fed. Appx. 848, 851 (11th Cir. 2017). However, a public

employee's First Amendment right to freedom of speech is not absolute because the public employer has an interest "in regulating free speech of its employees …" *McKinley v. Kaplan*, 262 F.3d 1146, 1149 (11th Cir. 2001).

To determine whether a public employer has retaliated against a public employee, the Eleventh Circuit engages in a four-part test based on *Pickering v. Bd. of Educ.*, 205, 391 U.S. 563, 568 (1963). Because the parties agreed for summary judgment purposes that Labriola spoke as a private citizen on a matter of public concern, the District Court only needed to weigh the employee's First Amendment interest against the interest of the state as an employer in promoting the efficiency of the public services it performs through its employees. [Id. * 3]. The District Court then considered: "1) whether the speech at issue impedes the government's ability to perform its duties efficiently, 2) the manner, the time and place of the speech, and 3) the context within which the speech was made." [*Id.] Morales v. Stierbeim*, 848 F. 2d 1145, 1149 (11th Cir. 1988).

### b. The Office of the Chair's Ability to Perform Its Duties Efficiently Was Disrupted by Labriola's Offensive Statements

In challenging the discipline imposed by Chairman Diaz, the District Court focused on the disruption caused by Labriola's Opinion Piece. [*Id.*]. On appeal, Labriola mistakenly ignores that public employers are "routinely afforded deference … when disciplining an employee whose speech threatens to disrupt efficient functioning of either the employer in general or the employee's department more

specifically." *Snipes at 852.* As the Supreme Court explained in *Connick v. Myers*, 461 U.S. 138 (1983), "the Government, as an employer must have wide discretion and control over the management of its personnel … Prolonged retention of a disruptive … employee can adversely affect discipline and morale … foster disharmony, and ultimately impair the efficiency of an office or agency …". *Id*. at 151.

A public employer's "legitimate interest in avoiding disruption does not require proof of actual disruption" only "reasonable possibility of adverse harm is all that is required." *Snipes* at 853, citing *Anderson v. Burke County*, 239 F. 3d 1216, 1220 – 21 (11th Cir. 2001) (finding that a public employer "need not wait for disruption or disturbance to occur before acting").

**Labriola's Patently Offensive Statements**

As the District Court noted, "although Plaintiff did write the [Opinion Piece] as a private citizen on his own time, a public employee has less First Amendment interest in speech that is disrespectful, demeaning and rude, even on a matter of public concern." *Id*. * 4. Labriola's use of vulgar and insulting terms justify little First Amendment protection.

Indeed, Eleventh Circuit precedent makes clear that whatever legitimate interest Labriola had in speaking on a matter of public concern is decreased by the vulgar and caustic statements in the article. *Snipes v. Volusia Cty*., 704 Fed. App'x

848, 854 (11th Cir. 2017) ("[T]there are many ways to communicate ones' thoughts, and the vulgar, derogatory phrases used by [appellant] weight against him."); *Hansen v. Soldenwagner,* 19 F.3d 573, 577 (11th Cir. 1994) (noting that public employee's use of vulgar, insulting and defiant language weighed against employee under the *Pickering* balance test); *McCullar v. Maloy*, 369 F. Supp. 3d 1230, 1239 (M.D. Fla. 2019) ("… vulgar and caustic nature of [plaintiff's] posts weakens plaintiff's interest in making them"). Other Circuit Courts take the same sensible view. *See Munroe v. Central Bucks School Dist*., 805 F.3d 454 (3d Cir. 2015) (despicable use of curse words by public school teacher was entitled to little First Amendment protection); *Lucorto v. Giuliani*, 447 F.3d 159 (2d Cir. 2006)(defendant's interest outweighed individual First Amendment rights in participating in float that featured offensive African American stereotypes).

On appeal, Labriola argues that a public employee may publish vulgar, bigoted, insulting remarks with impunity as long as the employee does not "work for law enforcement or in a supervisory role." [App. Br. p. 26. n. 16]. He is mistaken. While an employee's job classification is a factor to consider, employee speech that is vulgar and insulting is generally entitled to less weight in the *Pickering* analysis. *Frank v. Montgomery*, 679 Fed. Appx. 828, (11th Cir. 2017) (affirming summary judgment because "(t)he First Amendment does not require a public employer to tolerate a vulgar, embarrassing, vituperative, ad hominem attack … If

23

the manner and content of an employee's speech is demeaning, disrespectful, rude, and insulting, and is perceived that way in the workplace, the government employer is within its discretion to take disciplinary action"). *Shi v. Montgomery*, 679 F. App'x 828, 835 (11th Cir. 2007) (upholding government employer's decision to terminate employee in first amendment retaliation case after plaintiff called his employer a "dictatorial leader"); *Dartland v. Metropolitan Dade County*, 866 F.2d 1321, 1322 (11th Cir. 1989) (reversing denial of summary judgment for the County in a case involving a County employee that was not a law enforcement officer the Court held that "the manner, time, and place in which the employee's expression was aired are relevant. The manner of *Dartland*'s message was rude and insulting"). Accordingly, the District Court's decision to grant the County's summary judgment and deny the Plaintiff's summary judgment should stand.

**The District Court Correctly Quoted Plaintiff's Opinion Piece**

Lacking any real argument, Labriola also mistakenly argues that the District Court misquoted Plaintiff's statements in the Opinion Piece. [App. Br. pp. 40-41]. This argument must be rejected because the District Court properly quoted the offensive language in Labriola's Opinion Piece. (*Labriola* * 1).

Labriola stood "by every word" of his Opinion Piece. [ECF 45 Ex. 10 Labriola dep. p. 75]. Yet when confronted with his offensive words, Labriola now attempts to "moonwalk" and place those slurs in some type of context as if to make them

more palatable. *Id.* pp. 40-41. For example, Labriola wrote "child-molesting tranny" in his Opinion Piece. Labriola now claims that this statement was made in the context of a "hypothetical consequence of the Equality Act, which Labriola believed could pressure employees" to hire suspected sex offenders in fear of lawsuits. [App. Br. p. 41]. But Labriola's explanation rings hollow. If Labriola was concerned about "sex offenders," he would have written "sex offenders" without reference to a particular sexual orientation or sexual identity. Instead, Labriola wrote "child-molesting tranny" which labels transgender individuals as "child-molesters" – a needlessly despicable categorization of transgender people, which violates federal anti-discrimination law, Title VII of the Civil Rights Act, after the Supreme Court's decision in *Bostock v. Clayton County,* 140 S. Ct. 1731 (2020). In that decision, the Supreme Court ruled that gender identity is protected by Title VII. Simply put, Labriola cannot ignore or explain away the gratuitous flagrantly discriminatory remarks he published in an on-line article.

**Actual Disruption**

Here, the public outcry in response to Labriola's vulgar discriminatory comments was immediate and overwhelming. Shortly after the Opinion Piece was published, the Office of the Chair was inundated with telephone calls, emails, and voice messages by upset citizens demanding action, including letters from County residents Jonathan Edwards and Save Dade Executive Director Orlando Gonzalez.

Additionally, Chairman Diaz was hampered in his ability to conduct BCC Chairman duties because he was consumed by the barrage of phone calls, media inquiries, and complaints from County residents regarding Labriola's statements. Chairman Diaz also received phone calls from other County Commissioners including Commissioner Souto who were upset with Labriola's statements. As the District Court found, "the Opinion Piece did at least cause a minor scandal that impeded the government's ability to perform its duties efficiently. The Opinion Piece also disrupted the harmony of the Office: Diaz and several of Plaintiff's co-workers expressed at a minimum discomfort with and at the worse took offense at the Opinion Piece." *Id*. * 3. As such, Labriola's Opinion Piece "interfere[d] with the regular operations of the [Office of the Chair]" because the barrage of angry phone calls and email complaints disrupted several employees' work." *See Rankin*, 483 U.S. at 388, 107 S.Ct. 2891.

Furthermore, Lopez viewed the offensive statements as damaging the integrity of the Chair's Office. *Rankin*, 483 U.S. at 389, 107 S.Ct. 2891 (suggesting that speech discrediting a public employer would tend to justify remedial measures). According to Lopez, the most damaging by-product of Labriola's Opinion piece was to call into question whether the BCC Media Division – the publicity arm of the BCC – was capable of discharging its important duties in an impartial manner. As

Lopez explained, "we were dealing with a lack of confidence in County government because of something that was written [by Labriola]." *Id.*

Finally, Chairman Diaz had a strong interest in having a Media Division employee that he could fully trust to advance his message and the County Commission's policies, particularly a Media Aide like Labriola who wrote his speeches and press releases. *McKinley v. Kaplan*, 262 F.3d 1146, 1150 (11th Cir.2001) ("First, our cases indicate that governments have a strong interest in staffing their offices with employees that they fully trust, particularly when the employees occupy advisory or policy-making roles"). Indeed, Labriola's immediate supervisor Vega testified that she lost trust and confidence in Labriola in the light of his offensive statements. *See Rankin*, 483 U.S. at 388, 107 S.Ct. 2891. Clearly, the detrimental impact to Chairman Diaz caused by Labriola's slurs are pertinent considerations in finding that Labriola's three-day suspension was lawful. *Moss v. City of Pembroke Pines*, 782 F.3d 613, 621 (11th Cir. 2015) (in affirming summary judgment, court considered whether the employee's statement had detrimental impact on close working relationships for which personal loyalty and confidence was necessary or interested with regular operation of the enterprise).

**Expected Disruption**

Beyond the actual disruption to the Office of the Chair's functions highlighted by the District Court, Chairman Diaz was concerned about potential disruption. The

District Court did not reach the issue of potential disruption. Yet, Chairman Diaz's legitimate interest in avoiding disruption does not require proof of actual disruption. *Snipes v. Volusia County*, 704 F. App'x 848, 852 (11th Cir. 2017) (possibility of adverse harm is all that is required); *McCullars v. Maloy*, 369 F. Supp. 1230, 1240 (M.D. Fla. 2019)(no proof of actual disruption required).

Here, the undisputed evidence reflects that Chairman Diaz, who has served as a County Commissioner for over two decades, reasonably predicted that there would be disruptions to the Office of the Chair's functions and the community if he did not take action and discipline Labriola in early March 2021. *Waters v. Churchill*, 511 U.S. 661 (1994) (Courts "have given substantial weight to government employers' reasonable predictions of disruption, even when the speech involved is on a matter of public concern."); s*ee also Connick v. Myers*, 461 U.S. 138, 152 (S. Ct. 1983) (explaining it is not necessary "for an employer to allow events to unfold to the extent the disruption of the office and the disruption of working relationships is manifest before taking action.").

Had Chairman Diaz not taken swift action on March 5, 2021, and suspended Labriola for three days, further disruption of the Chair's Office was reasonably imminent. *See Snipes* at pp. 852-53. Indeed, SAVE Executive Director Orlando Gonzalez was contemplating conducting demonstrations if Chairman Diaz did not

take action. Labriola did not provide any evidence to refute Chairman's Diaz's reasonable prediction of disruption.

**Labriola Was Employed In A Sensitive And Confidential Position**

Labriola's employment as a BCC Media Aide weighed heavily in the County's favor. Labriola's duties included writing speeches and press releases for Chairman Diaz. A Media Aide, "confers with and *advises* constitutional officers regarding the adoption of publicity projects." (emphasis added). Labriola himself testified that he collaborated with Vega in writing Chairman Diaz' speech for his 2021 inauguration to the Chairman's post. As the District Court noted, Labriola "drafted media communications on behalf of various County commissioners, including press releases concerning legislative developments and city events, and talking notes for County Commissioners' speeches." *Id*. * 1. As such, Labriola served in a sensitive and confidential role as Chairman Diaz's speechwriter who literally "put words in" Chairman Diaz' mouth.

Finally, the Media Aide job description, as well as Labriola's own testimony, demonstrates that his role as a Media Aide involved some public contact on behalf of Chairman Diaz. Labriola earned a yearly salary of $70,000.00. Clearly, Labriola was not "a low level" employee as he suggests. [App. Br. pp. 3, 29].

Labriola argued below that while he worked as a Media Aide for Chairman Diaz he did not perform all of the duties listed in the Media Aide job description.

This is due in large measure because Plaintiff only worked for Chairman Diaz for less than four months in 2021. In any event, the Media Aide job description is not dispositive of all of the duties Plaintiff performed but it is instructive. *Millspaugh v. Cobb County Fire Emergency Services*, 2022 WL 17101337, *6 (11th Cir. 2022) ([i]n First Amendment case, noting that in reviewing employee's job responsibilities "(r)elevant, but not dispositive factors include: the employees job description.")

Beyond that, Chairman Diaz could remove Labriola from his Media Aide position with or without cause. Because Chairman Diaz had the power to remove Labriola with or without cause, Labriola needed to be responsive to Chairman Diaz' policy choices. *McKinley* at 1151 ("we have previously held that the power to remove individuals with or without cause implies that those individuals should be responsive to the policy choices of the authority at whose will they serve"); *Dartland v. Metropolitan Dade County*, 866 F.2d 1321, 1324 (11th Cir. 1989) ("the power to fire with or without cause implies that the Consumer Advocate should be responsive to the policy choices of the County Manager"). *See Branti v. Finkel*, 100 S.Ct. 1287, 1295 (1980) (stating in a First Amendment retaliation case that an elected official "may appropriately believe that the official duties of various assistants who help him write speeches, explain his views to the press … cannot be performed effectively unless those persons share his political beliefs…").

Two Eleventh Circuit First Amendment retaliation cases involving Miami-Dade County personnel are instructive. For example, in *Sims v. Metro Dade County*, 972 F. 2d 1230, 1237 (11th Cir. 1992), the plaintiff challenged his three-day suspension after he made disparaging remarks about a segment of the community. Sounds familiar. The Eleventh Circuit affirmed summary judgment and upheld a three-day suspension because plaintiff held a sensitive position that required public contact in the County's Department of Community Affairs. *Id.* at 1231. As this Court explained, "[w]hen an employee serves in a sensitive capacity that requires public contact, the employee's private speech may pose a substantial danger to the agency's successful functioning." *Id.* at 1237.

Similarly, in *McKinley v. Kaplan*, 262 F.3d 1146 (11th Cir. 2001), the Eleventh Circuit focused on the plaintiff's sensitive duties in affirming summary judgment. In *McKinley*, a County commissioner removed plaintiff from her position on the County's Film Board after plaintiff made inappropriate and insulting comments directed at the constituents he represented. *Id.* at 1148. The Court noted that plaintiff's position involved "some public contact" in finding that the *Pickering* balance favored the County. *Id.* at 1150. Both *Sims* and *McKinley* make clear that Labriola's sensitive role as a Media Aide tip the *Pickering* balance in the County's favor. This is particularly true here because Labriola's slurs offended and denigrated a segment of the community Chairman Diaz represents.

**Labriola Was Terminated for Insubordination Pure and Simple**

The District Court did not reach the County's argument that Labriola was terminated for insubordination. The District Court noted that "there is merit to Defendant's argument that Defendant did not dismiss plaintiff because of his religious beliefs but because of his blatant insubordination to his employer's orders to schedule and complete standard anti-discrimination training." However, the District Court concluded that the First Amendment questions presented here are dispositive of the issues as a whole. "Therefore, the Court need not and does not analyze Defendant's additional paragraphs." *Id*.

If the District Court had reached this issue it would have found that Chairman Diaz directed Labriola to schedule training on the County's anti-discrimination policy because Labriola violated IO 7-45 in spewing offensive statements "homosexual pedophile" and "child-molesting tranny." When Labriola failed to comply with Chairman Diaz' order to schedule the training session, Lopez followed up three times in March 2021 directing Labriola in writing to schedule the training and informing him that his failure to do so could result in termination. Yet, Labriola stubbornly refused to even schedule the training. In response, Chairman Diaz terminated Labriola for his insubordination. This is a straightforward undeniable basis for termination. Labriola's box ordered him to attend a training session. Despite being ordered multiple times to schedule the training, Labriola repeatedly

refused.  For him to now claim that it was his religion or expression that got him fired is frivolous.

Because Labriola refused to even schedule training, the court need not examine whether IO 7-45 training is an adverse employment action.  But even if it did, under *Pickering*, Labriola's right to avoid IO 7-45 training would be balanced against the County's interest in having Labriola complete the training and the County would prevail.  *Fiedor* at 1312 citing *Pickering*, 391 U.S. at 568.  It is important to note that Labriola did not even know the content of the training when he refused to schedule the training in March 2021. Labriola cannot object to scheduling the training on religious grounds if he did not even know what the training contained. Because Labriola has not shown that his Free Exercise rights were violated by directing him to participate in IO 7-45 anti-discrimination training, the District Court's Order should be affirmed.

**Plaintiff Cannot Confuse his Failure to Schedule Ttraining With his Desire Not to Attend Training**

Chairman Diaz made it absolutely clear in his termination letter that he terminated Labriola because Labriola refused to comply with direct orders to schedule training. [ECF No. 42 ¶¶ 66, 67].  Labriola does not contest the assertion that he refused to schedule training which effectively means that he admits that he engaged in the wrongdoing that was the basis for his dismissal.  Instead of owning

up to his defiant insubordination, Labriola attempts to conflate his refusal to *schedule* training with his refusal to attend training. These are two separate issues that cannot be intertwined. Accordingly, Labriola was terminated for a legitimate reason unrelated to his speech or religion and the district court's order should be affirmed.

According to Labriola, he did not schedule IO 7-45 training because he had no desire to attend IO 7-45 training because of some speculative concern about the training material. (App. Br. p. 30). He further speculated that "there is a good possibility that in this training session, the instructor would have pressured or forced Labriola to recant his view and/or say things he disagrees with." *Id*. While this may be a convenient *post hoc* excuse for not scheduling training, it is nonetheless insubordination and grounds for dismissal. For example, a plaintiff who intends on pleading "the fifth" to questions at his scheduled deposition, must still attend the deposition. *United States v. Hansen*, 233 F.R.D. 665, (S.D. Cal. Oct. 28, 2005)(distributor could not refuse to attend deposition under blanket claim of privilege against self-incrimination). Similarly, Labriola had to comply with Chairman Diaz's direct orders to schedule training even if Labriola decided not to attend the training at a later date or object to certain discussions.

This is particularly true here where Labriola was not aware of the content of the training when he defiantly made the decision not to comply with the direct orders

to schedule training. [ECF No. 42 §§64, 65]. It is important to note that Labriola could have sat through the training (it was not even in-person – it was remote) and disagreed with its content. He did not have to sign or attest that he agreed with the training content. If Labriola had an objection with a particular training provision, he could have raised that issue with his supervisor. Instead, he took matters into his hands in some misguided preemptive attack. The act of simply sitting through the IO 7-45 training does not violate the First Amendment's speech or religion provisions.

**Scheduling Training Is Not an Adverse Employment Action**

Because the District Court found no First Amendment violation, it did not reach the issues concerning the County's anti-discrimination training. "[A] public employer retaliates [in violation of the First Amendment] when [it] takes an adverse employment action that is likely to chill the exercise of constitutionally protected speech." *Stavropoulos v. Firestone,* 361 F.3d 610, 618 (11th Cir. 2004). An adverse employment action is an action that "involves an important condition of employment such as discharges, demotions, refusals to hire…." *Id*. at 619.

The Eleventh Circuit has held that requiring an employee to attend training is not an adverse employment action. *Summers v. Winter*, 303 F 3d. Appx. 716, 719 (11th Cir. 2008) (rejected claim that participation in a 5-day training program was an adverse employment action). Faithful to the Eleventh Circuit guidance, district

courts have consistently held that requiring an employee to attend anti-discrimination training is not an adverse employment action. *Soloski v. Adams, et al.*, 600 F. Supp. 2d 1276, 1356 (N.D. Ga. Mach 2, 2009) (requirement that employee participate in sexual harassment training "does not impact the terms, conditions, or privileges of the plaintiff's job in a real and demonstrable way."). *Cf Patrick v. City of Port St. Lucie*, 2007 WL 9702580, *3 (S.D. Fla. Dec. 4, 2007) (In First Amendment retaliation case, court held that pursuant to *Stavropoulos*, plaintiff did not suffer an adverse employment action when his request to attend training was denied); *see also Maddox v. Bennett*, 2023 WL 2727540, *7 (M.D. Ga. March 30, 2023) (applying *Stavropoulos* and finding no adverse employment action).

While Labriola's three-day suspension could be held to be an adverse employment action, directing an employee to schedule anti-discrimination training is not. Labriola did not suffer an adverse employment action when he was directed by Chairman Diaz and Lopez to **schedule a time for training remotely during paid work hours** with Elda Green. Labriola brazenly refused to follow this straightforward directive. Being ordered to send an email to schedule a training session is not an adverse employment action. Labriola never scheduled and never attended the training. Because Labriola did not even schedule the training, the Court need not reach the issue as to whether participating in anti-discrimination training is an adverse employment action.

In any event, had Labriola attended the training, he would have sat through a two-hour virtual training on the County's anti-discrimination policy while being in pay status during work hours. This online training class does not have a quiz component, nor did he claim that it had a quiz component before refusing to schedule it. Clearly, being required to attend anti-discrimination training does not constitute an adverse employment action. *Soloski* at 1356; *Burns v. City of Utica*, 590 Fed. Appx. 44, 49 (2nd Cir. 2014) (affirming summary judgment in § 1983 discrimination case because, *inter alia*, remedial training participation does not constitute adverse action); *Little v. JB Pritzker for Governor et al.*, 2021 WL 3666429, *15-16 (N.D. Ill. Aug. 13, 2021) (granting summary judgment in Title VII discrimination case because cultural sensitivity training was not an adverse employment action); *Freeman v. Rochester Psychiatric Center*, 2017 WL 4169336, *6 (W.D. N.Y. Sept. 20, 2017) (awarding summary judgment in Title VII case because requiring plaintiff to attend anti-discrimination training was not an adverse employment action quoting *Soloski*.); *Faulkner v. Univ. of Cincinnati, et al.*, 2015 WL 1299283, *8-9 (S.D. Ohio March 23, 2015) (court dismissed Title VII religious discrimination claim because attendance at sensitivity training seminar was not an adverse employment action); *Bourgeois v. United States Coast Guard et al.*, 151 F. Supp. 3d 726, 739-740 (W.D. La. Dec. 17, 2015) (holding in Title VII case that requiring plaintiff to attend cultural diversity training was not an adverse employment action); *cf. Duffy v. McPhillips*,

276 F.3d 988, 992 (8ᵗʰ Cir. 2002)(finding that change in duties was not an adverse action and reiterating that "[n]ot everything that makes an employee unhappy is an adverse employment action" under the First Amendment). Thus, Appellant fails to demonstrate reversible error regarding the claims in Counts I, II, IV, V, and VI. Accordingly, the District Court's Order should be affirmed.

## II. Appellant's Claimed Error on Count II Was Not Raised Below

In his initial brief on appeal, Labriola curiously claims that the District Court erred by applying the *Pickering* test to his First Amendment compelled speech claim in Count II. [App. Br. pp. 36-37]. This argument is improper because it is being raised for the first time on appeal. Even worse, this argument is directly contradicted by the position Labriola took before the District Court.

In his briefing on summary judgment in the district court, Labriola argued that his free exercise claims should be analyzed using the *Pickering-Connick* test. Specifically, Labriola **stated in the heading** that "the Court should not grant summary judgment … as to Counts I, **II** and III because … fail the Pickering Test for Public Employee Free Speech." *Id.* at p. 7 (emphasis added). [ECF 50, p. 1].

The District Court accepted Labriola's invitation and correctly applied the *Pickering* test to Count II. As the Court explained:

> "[Labriola] correctly argues that [his] free exercise clause challenges should be analyzed using the *Pickering-Connick* test under binding Eleventh Circuit precedent. *See Shahab v. Bowers*, 114 F.3d 1097 1111 n. 27) (11th Cir. 1997). Thus, the Court's analysis here covers counts I,

II, IV, V and VVI of the Amended Complaint, which are all based on
alleged violations of the free speech and free exercise clauses of the
First Amendment."

[*Labriola* at f.n.2].

Labriola cannot change legal theories and arguments for the first time on

appeal. *Depree v. Thomas*, 946 F.2d 784, 793 (11th Cir. 1991) ("Court will not

consider "an issue not raised in the district court and raised for the first time in an

appeal."). Accordingly, Labriola's new-found arguments on appeal as to Count II

should be summarily rejected.

Even if the Court were to review the claim in Count II alleging compelled

speech, the order below would be affirmed because Appellant failed to

demonstrate that scheduling and attending the County's anti-discrimination

training constitutes unconstitutional compelled speech.

*In Zdunski v. Erse 2*, *et al.*, 2022 WL 816010 (W.D. N.Y. Feb. 16, 2022), a §

1983 religious discrimination case, is instructive. In *Zdunski*, defendant directed

plaintiff to attend LGBTQ cultural sensitivity training or face discipline up to and

including termination. Plaintiff declined to attend the training on the basis that he

is a devout Christian and did not want "to be forced to listen to indoctrination that

is in contradiction to the tenants of his faith." In response, defendant established

that plaintiff was terminated because he did not attend a mandatory training on

"LGBTQ Cultural Competency." *Id.*

In granting summary judgment, the district court found that the plaintiff was terminated because plaintiff refused to attend a mandatory LGBTQ training session. *Id.* As the district court explained, "In sum, no facts in the record supports a finding that Mr. Zdunski was terminated because of his religion; rather, the evidence in the records supports Defendant's position that his termination was due to repeatedly refusing to attend a mandatory employee training." *Id*. *9.

If the training in *Zdunski* does not support a claim of religious discrimination, it is certainly the case that the training that Labriola was required to attend regarding the County's general anti-discrimination policy could not be found to have required Labriola to change his religious beliefs about gender and sexuality.

The claim in Count II is particularly deficient because Labriola was not aware of the content of the training when he made the decision not to comply with the direct orders to schedule training. [ECF No. 42 §§64, 65]. Also like in *Zdunski*, IO 7-45 training was mandatory for all employees. (*Id*. ¶ 14). Finally, the IO 7-45 training seeks to prevent employment discrimination that is unlawful under local, state and federal law, namely the Miami-Dade County Code Section 11A, Florida's Civil Rights Act, and Title VII of the federal Civil Rights Act.

### III. The District Court Properly Granted Summary Judgment as to Count III's Overbreadth Claim Because IO 7-45 Is Not Unconstitutionally Overbroad

In Count III, Labriola advances a facial and "as applied" overbreadth claim concerning the County's anti-discrimination policy IO 7-45 vis-à-vis his suspension and termination. The District Court, however, found that the IO 7-45 is not unconstitutionally overbroad. *Id.* * 4.

### The Overbreadth Challenge Should be Avoided Because Labriola Was Suspended for Additional Reasons Unrelated to IO 7-45

As an initial matter, an overbreadth review of IO 7-45 should be applied only as a last resort. *See Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1972) (overbreadth doctrine is to be applied "sparingly and only as a last resort."). The Eleventh Circuit declared that the "Supreme Court has long recognized the overbreadth doctrine is strong medicine and has employed it with hesitation, and then only as a last resort." *United States of America v. Fleury*, 20 F.4th 1353, 1362 (11th Cir. 2021) (citations omitted).

As set forth in the DAR, Chairman Diaz suspended Labriola for three independent reasons, each worthy of a three-day suspension. First, Labriola "made several inflammatory statements that were offensive to the community we serve." Second, the insulting statements are also inconsistent with IO 7-45. *Id.* Third, "(p)ublishing insulting language that attacks people based on gender identity and sexual orientation is inconsistent with your position as a Media Aide … ." *Id*. Chairman Diaz found that this was conduct unbecoming of a County employee. *Id*.

Because Chairman Diaz suspended Labriola for at least two reasons unrelated to IO 7-45, an overbreadth analysis of IO 7-45 is not necessary and should be avoided. *Vega v. Miller*, 273 F.3d 460, 465 (2d Cir. 2001) (noting, *inter alia,* review of college's sexual harassment policy for overbreadth violation was not necessary because teacher was terminated for other unrelated reasons). *See Crawford v. Fairburn, GA.,* 482 F.3d 1305, 1308 (11th Cir. 2007) ("Where an employer offers more than one reason for an adverse employment action, the plaintiff must rebut "each of the [proffered] reasons to survive a motion for summary judgment.").

Accordingly, the Court need not reach the overbreadth issue and the District Court's Order should be affirmed.

**IO 7-45 Is Not Unconstitutionally Overbroad**

In any event, the District Court tackled Labriola's overbreadth claim and found that IO 7-45 is not unconstitutionally overbroad. The District Court applied the Eleventh Circuit's test for overbreadth challenges set forth in *O'Laughin v. Palm Beach County*, 30 F. 4 1045, 1054 (11th Cir. 2022), and concluded that the County met its burden of showing that "the interest of present and future government employees, along with those of potential audiences are outweighed by that "expression" necessary impact on the actual operation of the Government. *Labriola* *4.

The District Court properly found that Chairman Diaz suspended Labriola because he violated IO 7-45's social media provision which reads:

**Personal Use of Social Media**

> Inappropriate postings or communications on personal social media that include discriminatory remarks, bullying, threats of violence or similar inappropriate or unlawful conduct constitute a violation of this policy.

> Examples of this type of conduct include offensive posts that … contribute to a hostile work environment on the basis of race, color, religion, ancestry, sex, pregnancy, national origin, … gender identify, gender express, sexual orientation… or any other category protected by local, state or federal law."

[ECF No. 45, Ex. 8, p. 6].

In the context of public employment, workplace standards like IO 7-45 are not void of vagueness as long as ordinary persons using ordinary common sense would be notified that certain conduct will put them at risk of discharge. *O'Laughlin v. Palm Beach County*, 30 F. 4 1045, 1055 (11th Cir. 2022). "Perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *United States v. Williams*, 553 U.S. 285, 304 (2008).

Labriola's overbreadth challenge is also inapposite because the blatantly discriminatory statements he published on an online platform fall squarely within the paraments of the County's policy and virtually any policy in America that is consistent with the Supreme Court's determination that gender identity discrimination violates Title VII of the federal Civil Rights Act. *Arnett v. Kennedy*,

416 U.S. 134, 159-64 (1974) (holding employment protection standard not impermissibly vague in regulating speech of federal employees); *Thaeter v. Palm Beach County Sheriff's Office*, 444 F.3d 1342, 1356 n. 13 (11th Cir. 2006) (holding that standard such as "conduct unbecoming an officer" have been upheld against challenges for vagueness). *See Esfeller v. O'Keefe*, 391 Fed. Appx. 337 (5th Cir. 2010) (University student was not likely to succeed on merits of claim because code of conduct term "harass" or "intimidate" were not impermissibly vague).

Here, the District Court held that the unconstitutionally vague social media policy in *O'Laughlin* was readily distinguishable from IO 7-45 social media section which prohibits discriminatory or harassing remarks. The District Court found that "IO 7-45 is sufficiently limited to prohibit 'discrimination and harassment' and also prohibits inappropriate postings or communication on personal social media that include discriminatory remarks, harassment, bullying, threats of violence, or similar inappropriate or unlawful conduct." These are sufficiently "discrete categories of speech." *Id*. * 4. The District Court is correct in finding that discriminatory and harassment are not vague terms.

The District Court also determined that "public employees have little First Amendment interest in expressing discriminatory or harassing language, and potential audiences have even less First Amendment interest in reading or hearing discriminatory or harassing language." *Id*. *4. The District Corut's analysis is sound.

Here, the District Court compared Palm Beach County's social media policy with Miami-Dade County's IO 7-45 and correctly held that IO 7-45 is "readily distinguishable." *Id* at 4. One reason why the County's IO 7-45 is not unconstitutionally overbroad is because it clearly provides examples of offensive posts which includes posts based on "gender identity" and "sexual orientation." *See Moore v. City of Roswell, Ga.,* 2023 WL 6370626, *8-9, (N.D. Ga. July 6, 2023) (distinguishing *O'Laughlin* and holding that defendants' social media policy was not constitutionally overboard). Accordingly, Labriola fails to show that his unnecessary and unsupported overbreadth challenge to the County's anti-discrimination policy in Count III requires reversal of the District Court's order.

## IV.    The Press Claim in Count VII Also Fails

In Count VII, Labriola alleged a section 1983 claim for violation of Labriola's freedom of the press. The District Court determined that even if Labriola was deemed to be a member of the press, Labriola is "afforded no greater First Amendment rights [than ordinary citizens], who are free to publish information as well." citing *Cooper v. Dillon*, 403 F.3d 1208, 1223 n. 3 (11th Cir. 205) (emphasis added).

Summary Judgment in the County's favor was appropriate for several reasons. There is no record evidence that the County restricted Labriola's freedom to act as a member of the press. Chairman Diaz' decision to suspend Labriola for three days

was an employment decision regarding Labriola's job, it did not purport to limit Labriola's right to act as a member of the press. Labriola was dismissed as an at-will employee of the County and not a press member. And Labriola's dismissal was because he repeatedly refused a simple order to schedule training, which had nothing to do with acting as a member of the press. Indeed, the District Court awarded summary judgment as to Labriola's freedom of the press claim because he "did not cite any authority to support his position that a private citizen, who is not a journalist, may bring a freedom of press claim based on one letter he submitted to a now-defunct online publication." *Id*. * 5. Accordingly, the District Court's Order should be affirmed.

## CONCLUSION

Labriola – a trusted speechwriter and media aide to one of the highest-ranking elected officials in town - called homosexuals and transexuals pedophiles and child molesters – the most vile of insults in an online publication. As such, Labriola's "speech" warranted little First Amendment protection. This is particularly true for Labriola, who served as a Media Aide for the elected Chair of the Miami-Dade County Board of County Commissioners. As such, Commissioner Diaz properly exercised his discretion in suspending Labriola for three days and directing Labriola to schedule and attend anti-discrimination training. Finally, Labriola's defiant and repeated refusal to comply with the simple order to schedule a training session was insubordinate and grounds for dismissal. Thus, summary judgment for Appellee Miami-Dade County should be affirmed on all counts.

## Certificate of Compliance

This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5), the type style requirements of FED. R. APP. P. 32(a)(6), and the type-volume limitation of FED. R. APP. P. 32(a)(7)(A) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word 2016 in 14-point Times New Roman for text and 14-point Times New Roman for headings, and it contains 9799 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii).

*/s/ William X. Candela*
William X. Candela
Assistant County Attorney

## Certificate of Service

I hereby certify that a true and correct copy of the foregoing was served on counsel for Appellant via Appellate CM/ECF on March 4, 2024.

*/s/ William X. Candela*
William X. Candela
Assistant County Attorney