[PUBLISH]

# In the
# United States Court of Appeals
## For the Eleventh Circuit

_____

No. 23-13508

_____

JOHN F. LABRIOLA,

                                                   Plaintiff-Appellant,

*versus*

MIAMI-DADE COUNTY,

                                                   Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:22-cv-23196-PCH

_____

Before ROSENBAUM, NEWSOM, and MARCUS, Circuit Judges.

NEWSOM, Circuit Judge:

When John Labriola was a media aide for the Miami-Dade Board of County Commissioners, he wrote an off-color opinion piece for an online newsletter. As a result, the County suspended him, ordered him to attend anti-discrimination training, and ultimately fired him. In the district court, Labriola alleged that the County retaliated against him for exercising his free-speech, free-exercise, and free-press rights, compelled him to express ideas with which he disagreed, and suspended him pursuant to an unconstitutionally overbroad policy. The district court granted summary judgment to the County on all counts. We affirm.

# I

## A

John Labriola was a media aide for the Miami-Dade Board of County Commissioners. *Labriola v. Miami-Dade Cnty.*, 693 F. Supp. 3d 1284, 1287 (S.D. Fla. 2023). In his own name and on his own time, Labriola wrote an opinion piece that criticized the Equality Act, an as-yet-unenacted bill that would prohibit discrimination based on sex, sexual orientation, and gender identity. *Id.* at 1288. In his piece, Labriola used inflammatory language to describe the LGBT people whom the bill sought to protect. He warned small-business owners "who resist surrendering their consciences to the new 'tranny tyranny'" that, if the bill was passed, "[i]t's going to be a choice of either baking that sodomy cake and hiring the scary-looking, child-molesting tranny with a beard or

being drowned in legal bills and driven out of business." Opinion Piece at 1, Dkt. No. 8-3. So too, Labriola warned local governments of what was to come: "No conservative small town in the South or Midwest will be safe from that weird study in perversity known as Drag Queen Story Hour, in which public libraries host a heavily made-up, flamboyant, homosexual pedophile in a dress who rolls around on the floor with little children as he reads them stories about gender fluidity and LGBT unicorns." *Id.*

Soon after, in an email to staff members of the Board of County Commissioners, a County citizen took issue with the opinion piece and questioned whether Labriola's views represented the County's. *Labriola*, 693 F. Supp. 3d at 1288. A County employee forwarded that email to the *Miami Herald*, after which the paper published an article describing the opinion piece as a "slur-laden tirade against transgender people." *Id.* (citation modified). At that point, the County received a barrage of phone calls from concerned residents. *Id.*

Labriola's supervisor suspended him from work for three days without pay and ordered him to schedule "training regarding the County's anti-discrimination policies" within seven days and to complete that training within 30 days. According to the Disciplinary Action Report, Labriola's supervisor's employment decisions were partially grounded in Miami-Dade Implementing Order 7-45, an anti-discrimination policy that "prohibits all forms of discrimination and harassment." Implementing Order at 1, Dkt. No. 8-15. Thirty days came and went, and, despite three written reminders,

Labriola never scheduled the training. *Labriola*, 693 F. Supp. 3d at 1288. For his failure to do so, he was terminated. *Id.* at 1289.

**B**

Labriola sued, challenging his termination on multiple First Amendment grounds. First, he alleged that by suspending him and ordering him to attend training on account of the opinion piece, the County retaliated against him for engaging in activity protected by the Free Speech, Free Press, and Free Exercise Clauses. Next, he asserted that by terminating him on account of his failure to attend the training, the County retaliated against him for refusing to undergo compelled speech—the training, Labriola surmised, would have required him to say things with which he disagreed. Labriola also contended that his termination violated his rights under the Free Exercise Clause, as "[h]e refused to undergo the extra training out of his religious obligation to not (as he sees it) speak falsely about human sexuality." Am. Compl. ¶ 177, Dkt. No. 8. Finally, Labriola alleged that the Implementing Order was unconstitutionally overbroad.

The district court granted summary judgment to the County on all counts. It disposed of Labriola's claims efficiently. In one fell swoop, it granted summary judgment to the County on all of Labriola's free-speech, free-exercise, and compelled-speech claims. *Labriola*, 693 F. Supp. 3d at 1291. Reasoning that the so-

called *Pickering-Connick* test[1] applied to each of these claims—a contention with which Labriola agrees, except as to his compelled-speech claim—the district court applied that test to Labriola's free-speech claim, ruled that the claim failed at the test's balancing step, and concluded that his other claims likewise failed. *Id.* at 1290–91. The court handled Labriola's free-press claim differently, ruling that, because Labriola "is not a journalist," he couldn't bring a free-press claim. *Id.* at 1292. Finally, in its analysis of overbreadth, the district court compared the Implementing Order to the policy at issue in *O'Laughlin v. Palm Beach County*, 30 F.4th 1045 (11th Cir. 2022). *Labriola*, 693 F. Supp. 3d at 1291. Concluding that the Implementing Order wasn't as broad as the policy at issue there, the district court granted summary judgment to the County. *Id.*

This is Labriola's appeal. He presents four issues for our review. First, he argues that his free-speech and free-exercise claims survive the *Pickering-Connick* test. Second, he challenges the district court's holding that, as a non-journalist, he is ineligible to assert a free-press claim. Third, he argues that the court should have analyzed his compelled-speech claim under *Janus v. American Federation of State, County, and Municipal Employees, Council 31*, 585 U.S. 878 (2018), rather than the *Pickering-Connick* test. Fourth, he reiterates

---

[1] *See Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968); *Connick v. Myers*, 461 U.S. 138 (1983).

his contention that the Implementing Order is unconstitutionally overbroad. We address his claims in turn.[2]

## II

First up, Labriola's free-speech and free-exercise claims. These claims are rooted in the First Amendment—as incorporated through the Fourteenth—which prohibits the government from "mak[ing any] law . . . prohibiting the free exercise [of religion]; or abridging the freedom of speech, or of the press." U.S. Const. amend. I. "[T]he law is well-established that the state may not demote or discharge a public employee in retaliation for" exercising his First Amendment rights. *See Bryson v. City of Waycross*, 888 F.2d 1562, 1565 (11th Cir. 1989). But a public employee's First Amendment rights are "not absolute." *Id.* That's because "the State's interest as an employer in regulating the speech of its employees differs significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Cook v. Gwinnett Cnty. Sch. Dist.*, 414 F.3d 1313, 1318 (11th Cir. 2005) (citation modified). To accommodate the dueling interests of employee and employer, we use a four-factor test derived from *Pickering v. Board of Education of Township High School District 205*, 391 U.S. 563 (1968), and *Connick v. Myers*, 461 U.S. 138 (1983):

> To prevail [on a First Amendment claim], an employee must show that: (1) the speech involved a matter of public concern; (2) the employee's free speech

---

[2] We review the grant of summary judgment de novo. *Anthony v. Georgia*, 69 F.4th 796, 804 (11th Cir. 2023).

    interests outweighed the employer's interest in effective and efficient fulfillment of its responsibilities; and (3) the speech played a substantial part in the adverse employment action. If an employee satisfies her burden on the first three steps, the burden then shifts to the employer [4] to show by a preponderance of the evidence that it would have made the same decision even in the absence of the protected speech.

*Cook*, 414 F.3d at 1318 (citation modified).

  Labriola contends that the district court misapplied the *Pickering-Connick* test to his free-speech and free-exercise claims.[3] The first step of that test requires us to evaluate whether Labriola's speech involved a matter of public concern. *Cook*, 414 F.3d at 1318. Here, the parties agree that it did. *See Labriola*, 693 F. Supp. 3d at 1290. So we begin at the second step: whether Labriola's free-speech interests outweighed the County's interest in effective and efficient fulfillment of its responsibilities. *Cook*, 414 F.3d at 1318.

---

[3] As already explained, *see supra* at 4–5, the district court applied the *Pickering-Connick* test only to Labriola's free-speech claim, ruled that this claim failed at the test's balancing step, and concluded that his free-exercise claim likewise failed. *Labriola*, 693 F. Supp. 3d at 1290–91. On appeal, Labriola takes a similar approach. In his brief, he argues at length about why his free-speech claim survives *Pickering-Connick*, but he mentions his free-exercise claim only at the very end of his analysis, in a footnote, which asserts that his free-exercise claim succeeds because it, too, is "based on the *Pickering-Connick* Test." Br. of Appellant at 35–36 n.20. We'll follow suit and apply the *Pickering-Connick* test one time—in its free-speech iteration—to assess both claims.

8                    Opinion of the Court                    23-13508

And because Labriola fails at this second step, it's also where our analysis will end.

In order to balance Labriola's free-speech interests against the County's efficiency interests, we must consider several factors, including "(1) whether the speech at issue impedes the government's ability to perform its duties efficiently, (2) the manner, time and place of the speech, and (3) the context within which the speech was made." *Morales v. Stierheim*, 848 F.2d 1145, 1149 (11th Cir. 1988). Taken together, these factors defeat Labriola's claim.

### A

*First*, did Labriola's speech impede the government's ability to perform its duties efficiently? The Supreme Court has "recognized as pertinent considerations whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin v. McPherson*, 483 U.S. 378, 388 (1987).

There is evidence that the opinion piece "impair[ed] . . . harmony among co-workers." *See id*. After one staff member read the opinion piece, she told Labriola's supervisor that she found it "[v]ery upsetting" because "she was offended by the words he used." Vega Dep. 31:10–14, Dkt. No. 45-4. Other coworkers were apparently shocked. Labriola's supervisor stated, "I think people just couldn't believe it." *Id.* at 33:2. Referring to one of Labriola's coworkers in particular, his supervisor recounted that "she knew

John, and she said something like I can't believe he would use those offensive words." *Id.* at 33:12–13.

The record also indicates that the opinion piece had "a detrimental impact on close working relationships for which personal loyalty and confidence are necessary." *See Rankin*, 483 U.S. at 388. Labriola's supervisor testified that after she learned of the opinion piece, she "kind of lost confidence in him." Vega Dep. 37:12–13. She elaborated: "[A]s my number [two], I would sometimes talk to him about certain things that pertained to each office that, you know, [we] kept to ourselves"—*i.e.*, confidential things—"so I just felt like I couldn't speak to him freely about those things anymore or get his opinion on certain things." *Id.* at 37:15–20. Moreover, she specified that it was because "the words that he used in the article were offensive to [her]" that she "couldn't really speak to him freely about things anymore." *Id.* at 38:20–23.

Finally, there is ample evidence that the opinion piece "interfere[d] with the regular operation of the enterprise." *See Rankin*, 483 U.S. at 388. The piece "brought a lot more work" to the office, in part because, following its publication, the office received "a lot of phone calls." Vega Dep. 29:20–21, 35:8–9. According to Labriola's supervisor, no other event had ever "caused such a large number of phone calls." *Id.* at 39:10–14. Confirming this description, the Chairman's chief of staff testified that the calls "became such a problem that it really prevented us from doing our day-to-day operations during those days." Lopez Dep. 75:5–7, Dkt. No. 45-15. He continued: "[W]e had to refocus a lot of our attention from

some of the legislative strategies that we had to dealing with the damage control. . . . [W]e were put in a situation where we had to reprioritize this issue with Mr. Labriola and completely step off from other initiatives that we had . . . ." *Id.* at 75:13–25.

On the whole, the evidence indicates that the opinion piece "impede[d] the government's ability to perform its duties efficiently." *See Morales*, 848 F.2d at 1149. Had Labriola presented any evidence to the contrary, there might have been a genuine issue of material fact. But he didn't, and so there isn't.

### B

*Second,* time, place, and manner. Labriola has time and place in his favor: He was off-duty and away from work when he wrote the opinion piece—a time and place at which his speech enjoys greater constitutional protection. *See Waters v. Chaffin*, 684 F.2d 833, 837–38 (11th Cir. 1982) (holding that a public employee had "an interest in being free from unnecessary work-related restrictions while off-duty[,] . . . after he had left work, while he was out of uniform, [and] while he was out of the department's jurisdiction").

But manner weighs heavily against him. "If the manner and content of an employee's speech is disrespectful, demeaning, rude, and insulting, and is perceived that way in the workplace, the government employer is within its discretion to take disciplinary action." *Mitchell v. Hillsborough Cnty.*, 468 F.3d 1276, 1288 (11th Cir. 2006) (citation modified). To put it mildly, the opinion piece was "disrespectful, demeaning, rude, and insulting." *See id.* And, based

23-13508               Opinion of the Court                    11

on the shock and appall of his coworkers, it was clearly perceived that way at the office.

## C

*Third*, context.  Precedent in both the Supreme Court and this Court has emphasized that the state possesses a greater interest in controlling employee speech when it occurs in public, rather than private.  See *Morales*, 848 F.2d at 1150 ("While Morales' poor choice of words in criticizing [the Melrose Board's chairman] might be less significant in a private context, when spoken at the public meetings of the Board these remarks impeded [his public employer]'s interests in Melrose." (footnote omitted)); *Rankin*, 483 U.S. at 389 ("Nor was there any danger that McPherson had discredited the office by making her statement in public."); *Waters*, 684 F.2d at 838–39 ("We do not doubt that the department may restrict the actions of its off-duty officers in many ways, but it does not follow that these off-duty restrictions may unnecessarily impinge upon private, social conversation." (footnote omitted)).  Labriola disseminated his views through an opinion piece in a public, online newsletter—as opposed to, say, a private conversation with a friend.  So "context" indicates that Labriola's interest in his speech is limited.

★ ★ ★

On balance, these factors make clear to us that the County's interest in effective and efficient fulfillment of its responsibilities outweighs Labriola's free-speech interests.  Accordingly, we hold that the County prevails at the second, balancing step of the

*Pickering-Connick* test, and so we need go no further. We affirm the district court's judgment rejecting Labriola's free-speech claim.

### III

Labriola also challenges the district court's holding that because he "is not a journalist," he can't bring a free-press claim. *Labriola*, 693 F. Supp. 3d at 1292. Labriola is right that the district court erred in so holding. *See Branzburg v. Hayes*, 408 U.S. 665, 704 (1972) (holding that "[f]reedom of the press is a fundamental personal right which is not confined to newspapers and periodicals" (citation modified)). Even so, his free-press claim fails on the merits.

Labriola's only substantive argument is that "even if [his] freedom of the press claim sinks or swims with his other First Amendment claims (as the district court implies), it swims in this case because the other First Amendment claims succeed." Br. of Appellant at 40 (footnote omitted). But as just explained, his free-speech and free-exercise claims fail. Labriola might have offered additional free-press arguments, separate from those underlying his First Amendment arguments. But he didn't, so his free-press claim sinks along with them.

Accordingly, we affirm the district court's judgment rejecting Labriola's free-press claim.

### IV

Next, Labriola contends that the district court erred in rejecting his compelled-speech claim. In particular, Labriola takes issue with the district court's application of the *Pickering-Connick* test

23-13508               Opinion of the Court                      13

to his compelled-speech claim. The court, he insists, should have applied *Janus v. American Federation of State, County, and Municipal Employees, Council 31*, 585 U.S. 878 (2018). *See* Br. of Appellant at 37.

To Labriola's credit, *Janus* did call *Pickering* a "poor fit" for compelled-speech claims. 585 U.S. at 909. Ultimately, though, the Court there held that the question whether "*Pickering* applies at all to compelled speech" was "a question that [it would] not decide." *Id.* at 908. And most problematically for Labriola, *Janus* didn't purport to establish a new or different compelled-speech test for government employees. Instead, to reach its holding that the state's compulsion of speech was unconstitutional, it employed a modified version of the *Pickering* test. *Id.* at 909–916.

In the years since *Janus*, neither the Supreme Court nor this Court has clarified what legal test governs public-employee compelled-speech claims. Happily, we needn't resolve that question today because, as a threshold matter—and irrespective of the applicable framework—we must first determine whether the record evidence supports a finding that the County compelled Labriola to speak. It doesn't.

Labriola asserts that "there is a good possibility that in th[e] [anti-discrimination] training session, the instructor would have pressured or forced [him] to recant his views and/or to say things that he disagrees with." Br. of Appellant at 38. In particular, Labriola suggests that the training would have compelled him to disavow his opposition to "transgenderism, homosexual marriage, and

Drag Queen Story Hours." *Id.* But the record evidence undermines Labriola's allegation. As part of his discipline, Labriola was directed to attend a generic anti-discrimination training, whose accompanying presentation barely touched on LGBT-related topics. The presentation mentioned such issues only twice: (1) by listing "sexual orientation" and "gender identity or expression" as among twelve "[p]rotected [c]lasses," and (2) by including "LGBTQ Awareness" as one of seven training modules available to—but not required of—County employees. Overview of the County's Anti-Discrimination Policy at 6, 24, Dkt. No. 1-20. Labriola offers no evidence to the contrary—he relies solely on his conjecture that there was a "good possibility" that he would have been made to say something with which he disagreed. Even construed in the light most favorable to him, *see* Fed. R. Civ. P. 56, his allegation is rank speculation. And "[s]peculation does not create a *genuine* issue of fact." *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005).

We accordingly affirm the district court's judgment rejecting Labriola's compelled-speech claim.

## V

Finally, Labriola raises a facial overbreadth challenge to the Implementing Order on which the County partially grounded its employment decisions.[4] The policy, which applies to all County

---

[4] Labriola purports to bring both facial and as-applied overbreadth claims. But an overbreadth claim is never as-applied; it is, by its nature, a facial challenge. *See United States v. Williams*, 553 U.S. 285, 292 (2008) ("According to our First

employees, "prohibits all forms of discrimination and harassment." Implementing Order at 1. It defines "unlawful harassment" as "unwelcome conduct based on a protected class where the conduct: (1) [h]as the purpose or effect of creating an intimidating, hostile, humiliating, or offensive working environment; (2) [h]as the purpose or effect of unreasonably interfering with a person's work performance; or (3) [o]therwise adversely affects a person's employment opportunities." *Id.* at 3.

Labriola's overbreadth claim fails at the gate. The Supreme Court has held that in order to succeed on a facial overbreadth challenge, an "appellant must demonstrate from the text of [the law] and from actual fact that a substantial number of instances exist in which the [l]aw cannot be applied constitutionally." *New York State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 14 (1988). And where the appellant hasn't "describe[d] the instances of arguable overbreadth of the contested law," a court generally will "not apply the strong medicine of overbreadth analysis." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008) (citation modified).

Here, Labriola hasn't described the instances in which the Implementing Order couldn't be applied constitutionally. Accordingly, we decline to administer the overbreadth doctrine's "strong

---

Amendment overbreadth doctrine, a statute is *facially* invalid if it prohibits a substantial amount of protected speech." (emphasis added)).

medicine." We affirm the district court's judgment rejecting Labriola's overbreadth claim.

## VI

For the foregoing reasons, we **AFFIRM** the district court's grant of summary judgment to the County on all counts.[5]

---

[5] Labriola's motion to strike portions of the County's brief is **DENIED**.